Craton LIDDELL, et al., and Earline Caldwell, et al., City of St. Louis, Janice Adams, et al., and Mary Puleo, et al., United States of America, Appellees,

v.

BOARD OF EDUCATION OF the CITY OF ST. LOUIS, et al., and State of Missouri, et al., Special School District of St. Louis County, St. Louis County, et al., and Affton School District, et al., Appellants.

Nos. 81–1828, 81–1940, 81–2003, 81–2042, 81–2043, 81–2086, 81–2127 and 81–2134 to 81–2140.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 11, 1982.

Decided Feb. 25, 1982.

Joseph R. Niemann, City Counselor, Robert H. Dierker, Jr., Francis M. Oates, Asst. City Counselors, St. Louis, Mo., for City of St. Louis.

John Ashcroft, Atty. Gen., Larry R. Marshall, Daniel R. Schramm, Steven W. Garrett, Robert L. Presson, Asst. Attys. Gen., Jefferson City, for State appellees.

George J. Bude, Clayton, Mo., for appellees Bayless, Brentwood, Hancock Place and Jennings School Districts.

Anthony J. Sestric, St. Louis, Mo., for Janice Adams, et al.

Burton M. Greenberg, David C. Welsch, London, Greenberg & Fleming, St. Louis, Mo., for Craton Liddell, et al.

Thomas E. Dittmeier, U. S. Atty., St. Louis, Mo., Wm. Bradford Reynolds, Asst. Atty. Gen., Walter W. Barnett, James W. Clute, Attys., Dept. of Justice, Washington, D. C., for the United States.

Edward E. Murphy, Jr., Clayton, Mo., for School Dist. of Riverview Gardens.

Thompson & Mitchell, Donald J. Stohr, James W. Erwin, R. J. Robertson, Jr., St. Louis, Mo., for Parkway School Dist.

Robert G. McClintock, St. Louis, Mo., for Ladue School Dist.

Thomas W. Wehrle, St. Louis County Counselor, Andrew J. Minardi, Susan Pippa, Asst. County Counselors, Clayton, Mo., for St. Louis County Government defendants.

William E. Caldwell, Richard B. Fields, Ratner & Sugarmon, Memphis, Tenn., Thomas I. Atkins, Teresa Demchak, New York City, William Taylor, Washington, D. C., for appellants Earline Caldwell, et al.

John H. Lashly, Paul B. Rava, Kenneth C. Brostrom, Stephen A. Cooper, Lashly, Caruthers, Thies, Rava & Hamel, A Profes-

sional Corp., St. Louis, Mo., David S. Tatel, George W. Miller, Allen R. Snyder, Hogan & Hartson, Washington, D. C., for Bd. of Ed. of City of St. Louis, et al.

Before HEANEY, BRIGHT and STEPHENSON, Circuit Judges.

HEANEY, Circuit Judge.

Questions concerning the integration of the public schools of the City of St. Louis have been before this Court on numerous occasions and before the United States Supreme Court three times.[1] Pursuant to our opinions and those of the United States District Court for the Eastern District of Missouri, some steps toward the goal of an integrated school system have been taken. The previously all-white schools in South St. Louis have been integrated. Some integrated educational programs and opportunities have been provided to the 30,000 black students who still attend all-black schools, and efforts are being made to improve the quality of education in those schools. A number of integrated magnet schools have been opened. A start has been made toward integrating the vocational education programs of the city and county schools. In addition, a modest beginning toward voluntary interdistrict desegregation has been undertaken. As in many school districts with a long history of racial segregation, progress has been slow. Firm direction, however, has been provided by former Chief Judge James Meredith and Judge William Hungate.

The major questions presented in these appeals may be grouped into four categories:

■ (1) *Desegregation Costs.* Did the district court err in determining the share of the 1980–1981 costs for desegregating St. Louis schools that the State of Missouri was obligated to pay; in determining that the state would be required to pay one-half of the actual desegregation expenses in the 1981–1982 budget; and in determining that the state was required to pay certain costs relating to the implementation of the voluntary interdistrict plan.

We hold that it did not err in any of these rulings. We urge the State of Missouri to participate in the budget-making process so that the annual budget can be determined on a cooperative rather than an adversary basis.

■ (2) *Vocational Education.* Did the district court err in adopting a plan for the merger of vocational educational programs of the city and county schools and in requiring the state to pay certain costs relating to the merger.

We hold that it did not and emphasize the necessity of closely monitoring the plan to ensure that the integration goals set forth therein are promptly and fully met.

■ (3)(a) *Joinder of Suburban Districts and County Units of Government.* Did the district court err in joining St. Louis County, certain county officials and seventeen suburban schools in St. Louis County as parties-defendant in the pending case and in postponing a decision as to whether other suburban school districts and governmental units should be joined.

We hold that we are without jurisdiction to consider these questions.

(b) *The 12(c) proceedings and interdistrict relief.* Did the district court err in severing the issue of mandatory interdistrict relief from the pending paragraph

1. We have filed three major opinions in this litigation: *Liddell v. Board of Education*, 667 F.2d 643 (8th Cir. 1981), *cert. denied*, 451 U.S. 902, 101 S.Ct. 1967, 68 L.Ed.2d 290 (1981) (*Liddell II*); *Adams v. United States*, 620 F.2d 1277 (8th Cir.) (en banc), *cert. denied*, 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980) (*Adams*); and *Liddell v. Caldwell*, 546 F.2d 768 (8th Cir. 1976), *cert. denied*, 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977) (*Liddell I*).

We have also filed two orders which are referred to in this opinion. *Liddell v. Board of Education*, Nos. 81–1184, et al. (8th Cir. Dec. 2, 1981) (order) (*Liddell IV*); and *Liddell v. Board of Education*, 667 F.2d 643 (8th Cir. 1981) (order) (*Liddell III*).

The shortened reference form designated in the parenthetical following each citation will be utilized for subsequent citations in our opinion.

12(c)[2] proceedings and in requiring that the latter proceedings go forward immediately even though questions relating to the liability of suburban school districts and county defendants have not been adjudicated and even though no suburban school districts are parties to the 12(c) proceedings.

We hold that the severance order is not presently appealable, but suggest that the interdistrict liability proceedings be temporarily postponed until after the district court has entered its order in the pending 12(c) proceeding and that they go forward promptly thereafter. In so holding, we note that relief granted in present 12(c) proceeding must be based on the established liability of the state defendants and the Board of Education of the City of St. Louis. We emphasize that suburban school districts that voluntarily participate in efforts to integrate city schools will not, by such participation, admit liability or waive any right that they may presently have to be excluded from a plan of mandatory interdistrict desegregation.

(4) *Recusal.* Did Judge Hungate err in failing to recuse himself from conducting further proceedings in the intradistrict aspects of this case, including the paragraph 12(a)–12(d) proceedings, or in recusing himself from its interdistrict component.

We hold that we are without jurisdiction to entertain an appeal on these recusal issues and we deny mandamus relief. We observe, however, that no legal basis appears to support Judge Hungate's recusal from either phase of the case. This case was originally assigned to Judge Hungate by Chief Judge H. Kenneth Wangelin. On

remand, the Chief Judge may, if he deems it in the interests of judicial administration, reassign Judge Hungate to the interdistrict phase of the case or assign that phase to another judge.

(1) *Desegregation Costs.*

Two appeals have been filed with respect to payment of the costs of integrating the city schools. In No. 81–1940, the state renews its contention that it cannot be required to pay the costs of implementing a 12(a) plan for voluntary pupil transfers between the city schools and those of St. Louis County. It also asserts that the district court erred in approving the city school budget for Year Two of the desegregation plan and in requiring it to pay one-half of the desegregation costs for that year. In No. 81–2003, the Board of Education of the city schools challenges the district court's determination with respect to the costs of desegregation that are to be borne by the state for the 1980–1981 school year.

(a) *The State's Liability Under 12(a).*

We held in *Adams* that the state had substantially contributed to the segregation of the public schools of the City of St. Louis.[3] No appeal was taken from that decision by the state. That decision has been settled and will not be reopened. *See generally United States v. United States Smelting, Refining and Mining Co.,* 339 U.S. 186, 198, 70 S.Ct. 537, 544, 94 L.Ed. 750 (1950); 1 B. Moore's Federal Practice ¶ 0.404, p. 401–405 (1980). In addition, we specifically sustained the validity of paragraph 12(a) of the district court's order of May 21, 1980, in our February 13, 1981,[4]

---

**2.** In its order of May 21, 1980, the district court directed, in paragraph 12(c), that the state defendants and city board develop and submit a suggested plan of interdistrict school desegregation necessary to eradicate the remaining vestiges of government-imposed school desegregation in the City of St. Louis and St. Louis County. *Liddell v. Board of Education,* 491 F.Supp. 351, 353 (E.D.Mo.1980). We expressly affirmed paragraph 12(c) both as originally entered, *Liddell II,* at 651, and as subsequently amended by the district court, *Liddell III,* at 648–654. Paragraph 12(c), as we subsequently

observed, "essentially requires the development and submission of proposed interdistrict desegregation plans * * *." *Liddell IV,* slip op. at 8.

Paragraph 12(c) apparently has confused many parties. As a result, we discuss that provision in Part (3)(b), *infra.*

**3.** *Adams, supra,* 620 F.2d at 1294 & n.27, 1295 & n.28. *See also Liddell II,* at 654.

**4.** *Liddell II,* at 651. Paragraph 12(a) directed the state defendants and city board to "make

decision. The Supreme Court denied certiorari review of that decision on November 30, 1981.[5]

■ Paragraph 12(a) is entirely enforceable against the state defendants; they are primary constitutional wrongdoers and, therefore, can be required to take those actions which will further the desegregation of the city schools even if the actions required will occur outside the boundaries of the city school district. *Hills v. Gautreaux*, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976).

(b) *The Desegregation Budgets (1980–1981 and 1981–1982).*

In our February 13, 1981, decision, we affirmed the district court's plan for integrating city schools. *Liddell II*, at 647, 648–653. We also affirmed the district court's order which required the state to pay one-half of the actual costs of implementing that desegregation plan in four equal installments. *Id.* at 654–55. These determinations are the law of the case.

The desegregation plan was implemented by the city board at the beginning of the 1980–1981 school year. The estimated cost of implementing the plan for the 1980–1981 school year was just over twenty-two million dollars and the district court approved a budget in that amount. *Liddell v. Board of Education*, 491 F.Supp. 351, 356 (E.D.Mo. 1980).[6] The actual cost for that school year was less than budgeted—approximately nineteen million dollars. The city board contends that the state refused to pay its

full one-half share of these costs. It asserts that the district court erred in failing to grant the city board's motion to compel the state to pay the city board an additional $1,042,000.[7] *See Liddell v. Board of Education*, No. 72–100C(4) (July 14, 1981) (H(237)81).[8] The city board also contends that "the bulk" of the programs for which expenditures were made—and to which the state objects—"were specifically mandated by the desegregation plan, with the few remaining items being required, without dispute, by necessary implication." Accordingly, it submits that the expenditures at issue are a legitimate part of the total cost of integration and the state should be required to pay its full one-half share.

The state concedes that it forwarded a fourth-quarter payment of $894,668.50 to the city board instead of the $1,324,668 requested. It argues, however, that the specific expenditures it contests "were not included in the 1980–1981 budget approved by the [district court] * * * on May 21, 1980." It also contends that the equities of this case are in its favor because "[s]ubstantial portions of the programs in question were funded from in kind contributions from private and governmental sources." The state also charges that the city board's financial figures contain unexplained discrepancies and that the city board's bookkeeping evidences "sloppiness and inefficiency." In short, the state contends that the district court's rulings concerning the funding of the Year One (1980–1981) desegregation budget were well within its discretion.

every feasible effort" to work out a voluntary plan of interdistrict pupil exchanges between the city school district and the suburban districts. *Liddell v. Board of Education, supra,* 491 F.Supp. at 353. *See also Liddell III,* at 648–650; *Liddell II,* at 651.

Paragraph 12(a) was designed to help remedy the proven unconstitutional segregation of the city schools as part of and in conjunction with the overall desegregation plan which we approved in *Liddell II.*

**5.** *See* n.1, *supra.* In its petition for a writ of certiorari, the state contended in part that the district court exceeded its authority in ordering the preparation of a voluntary interdistrict pupil exchange plan (paragraph 12(a)) because an interdistrict violation was neither pleaded nor proven and it should not be held responsible to

fund an interdistrict plan on the basis of an intradistrict violation.

**6.** We affirmed the district court's decision in *Liddell II.*

**7.** The $1,042,000 figure was supplied by counsel for the city board at oral argument. The district court's July 14, 1981, order (H(237)81) stated that $1,452,000 was the sum in dispute.

**8.** The district court subsequently denied the city board's motion to reconsider the July 14, 1981, order and the city board's supplemental motion to compel on August 5, 1981. *Liddell v. Board of Education,* No. 72–100C(4) (E.D.Mo., Aug. 4, 1981) (H(294)81 and H(301)81).

The city board's reply brief correctly argues that the sole fiscal issue for Year One is to determine the numerical figure which constitutes one-half of the actual costs ($19,152,503) of the 1980–1981 desegregation plan.[9] It asserts that instead of paying its one-half share of $9,576,251, the state has paid only $8,530,000.

The district court refused to order the state to pay a larger share of the 1980–1981 budget. It stated:

> To determine proper allocation of the costs of desegregation programs, even though supported by the Danforth Foundation and other contributors, the City Board's in haec verba interpretation of Judge Meredith's order and appeals court's opinion is literally correct. In exercising its powers in equity, however, the Court is reluctant to impose such a restrictive application of funding orders.

> Because the expenditures for budget items captioned Other Programs have been offset by the Danforth Foundation and other contributors, the Court finds that the actual cost to the City Board of implementing the desegregation plan has been reduced by public and private contributions.

Judge Meredith's order of May 21, 1980, required the state to pay one-half of the cost of implementing and operating the city board's desegregation plan for the year 1980–1981. Our opinion of February 13, 1981, affirmed that order and emphasized that only actual costs were to be included in the total.[10] Both this Court and the district court were aware of the fact that the federal government would pay a portion of the total costs and that such payments would serve to reduce the city school board's share of the total and not the state's share. Neither Judge Meredith nor this Court considered or discussed the possibility that others, including individuals, corporations, associations or foundations, would make contributions in kind or cash toward the costs of implementing or operating the desegregation plan. In logic, had this Court considered this possibility, it would have deemed such contributions to be comparable to the federal grants and would have directed that such contributions serve to reduce the city school board's, rather than the state's, share of the desegregation costs. But we did not consider that possibility. We are, therefore, reluctant to hold that the district court abused its discretion in giving the state the credit that it did in determining what constituted the state's one-half share for the first budget year, particularly since specific budget items are disputed.

Lest there be any misunderstanding, however, we make it clear that for budget Year Two (1981–1982) and succeeding budget years, the state is required to pay one-half of the *total actual costs* of implementing and operating the desegregation plan. The state's share shall not be reduced by grants or contributions received by the city board from other public or private agencies, individuals, associations or corporations to the extent that such grants or contributions are used to defer actual costs which have been approved by the district court in the budgetary process or thereafter. The district court, of course, retains discretion to determine which actual costs are reasonably necessary for the implementation or operation of the plan to desegregate the city schools.

One further point should be made. The district court and this Court are ill-equipped to determine what the fair, reasonable and actual desegregation costs are. The state and the city board, on the other hand, have experts who regularly and routinely work on such matters. They should be involved in the budget-making process at an early date so that disputes can be resolved on a cooperative, rather than an adversary, basis.

The federal government, the state and the city school board all face a period of budgetary restraints. It will require maxi-

---

9. *See Liddell IV*, slip op. at 7. The state must pay one-half of the actual desegregation costs under this plan. *E.g., Liddell II*, at 654–55.

10. *Liddell II*, at 655.

mum cooperation among them, as well as continued private contributions, if the constitutional rights of the black children of St. Louis are to be fully protected. We trust that such maximum cooperation will be forthcoming from the parties to this litigation. We commend those in the private sector who have given and will give of their time, money and resources to this most important endeavor.

(2) *Vocational Education.*

(a) *Background.*

On May 21, 1980, the district court made the following finding of fact:

The existing dual system of vocational education split between the City and St. Louis County is neither educationally sound or administratively efficient. These systems, established in 1965 and 1967, are further evidence of the continuing failure of the State to take any effective measures to disestablish the dual system in the State. The State has the power to effectively merge these systems. Its failure to exercise that power is part and parcel of its failure to take affirmative steps to eradicate root and branch the dual system it once formally mandated.

*Liddell v. Board of Education, supra,* 491 F.Supp. at 358. In a separate provision of its May 21, 1980, decision, paragraph 12(b), the district court ordered the state defendants and the St. Louis City Board of Education

[t]o develop and submit to the Court * * * a plan for the consolidation or merger and full desegregation of the separate vocational educational programs operated by the Special District of St. Louis County and the school district of the City

of St. Louis, for implementation in 1981–82 school year.

*Id.* at 353.

On February 13, 1981, this Court affirmed both the district court's factual finding and its paragraph 12(b) order. *See Liddell II,* at 651, where we held:

Section (b) of paragraph 12 is also consistent with the district court's responsibility to order a remedy for existing constitutional violations. The district court specifically found that the State of Missouri's establishment and maintenance of the separate Special District for vocational education was "part and parcel of its failure to take affirmative steps to eradicate root and branch the dual system it once formally mandated." 491 F.Supp. at 358. Section (b), therefore, was designed to remedy a violation of the State of Missouri. Moreover, the Special District has now been joined as a party defendant in this lawsuit.[11] We see no reason to prevent the opening of a consolidated integrated vocational school at the beginning of the 1981–1982 school year.

Counsel for the state conceded at oral argument that the district court expressly found that the state committed an interdistrict constitutional violation by failing to merge the segregated city-county vocational programs. Although the state disagrees with that district court finding, we adhere to our February 13, 1981, affirmance of that finding and our approval of paragraph 12(b).[12]

Pursuant to the rulings by the district court and this Court, the St. Louis City Board of Education, the state defendants and the Special School District of St. Louis County (SSD) submitted proposed plans to remedy the segregated vocational education programs in the city and SSD. *Liddell v.*

---

11. The Special School District of St. Louis County (SSD) was joined as a party defendant on September 12, 1980. *See, e.g., Liddell v. Board of Education,* No. 72–100C(4), at 2 (E.D.Mo. June 11, 1981) (H(181)81).

12. We also note parenthetically that in September of 1978, the Office of Civil Rights (OCR) of the United States Department of Health, Education and Welfare found that the state's de-

partment of elementary and secondary education failed to comply with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, with respect to the St. Louis metropolitan area vocational education programs. The OCR found, inter alia, that establishment of separate city-county vocational service areas did not comply with certain Title VI regulations.

*Board of Education,* No. 72–100C(4), at 3 (E.D.Mo., June 11, 1981) (order designated as H(181)81). The district court's June 11, 1981, order (H(181)81) provides the following progression of events. On March 4, 1981, the district court set a hearing to begin on May 11, 1981, to consider the vocational education issues and establish pretrial procedures. The court subsequently specified an agenda and delineated the issue and evidence presentation schedule to be followed at the May 11, 1981, hearing. On May 8, 1981, the SSD filed another vocational education proposal which prompted extensive negotiations among the parties. The negotiations resulted in "a proposed consent decree supported by a majority of the parties and also a [proposed vocational education] plan agreed to by all the parties except the intervening * * * Adams group plaintiffs." Along with a proposed funding order, these documents were submitted to the district court on May 20, 1981.[13]

The district court convened the vocational education hearing on May 11, 1981. At that time, the parties advised the district court that a settlement on the paragraph 12(b) vocational issues was "embarrassingly close." At the parties' request, the district court deferred holding the 12(b) hearing and as the settlement negotiations continued, the district court continued the 12(b) hearing on a day-to-day basis. The negotiations culminated in a written proposal and, on May 20, 1981, the parties submitted not only their consent decree, but also a proposed vocational education plan and funding order to the district court.

On the following day, a hearing was conducted during which the district court admitted, without objection, certain stipulations of fact and various exhibits offered by the United States. After all parties were allowed an opportunity to be heard, the district court issued a separate funding order and made the proposed consent decree and 12(b) plan part of the record.[14]

On May 27, 1981, the parties were notified that a hearing on the proposed paragraph 12(b) consent decree would begin on June 9, 1981. A notice to the Liddell class members was issued on that same day and the district court granted leave to interested individuals to request permission to appear in support of or in opposition to the proposed decree or to file written memoranda stating their views.[15] The Adams group filed written objections to the 12(b) consent decree, the Liddell group orally expressed opposition to the consent decree, three letters from the public were received by the district court and the University City School District filed a memorandum commenting upon the parties' 12(b) proposal. The SSD and United States filed memoranda in support of the consent decree on June 2 and June 8, 1981, respectively.[16]

The district court summarized the submitting parties' positions thus:

> The parties have, in numerous filings with this Court, the Court of Appeals, and the United States Supreme Court, stated their positions as to the facts and law regarding the issues. In the proposed consent decree submitted to the Court, the parties recited that
>
>> By consenting hereto no party retracts its previous positions or concedes that its respective positions are in any way

---

**13.** More specifically, the proposals were submitted by the state, SSD, United States, NAACP-Caldwell plaintiffs and City of St. Louis. The district court signed the consent decree on May 21, 1981. *Liddell v. Board of Education,* No. 72–100C(4) (E.D.Mo. May 21, 1981) (order designated as H(132)81).

**14.** The funding order was independently drafted by the district court and was not a part of the parties' other agreements and submissions. The funding aspects of the vocational education programs are separately discussed in part (2)(c), *infra.*

**15.** Even though the district court had signed the consent decree on May 21, *see* note 13, *supra,* it continued to treat the submissions as proposed, and eventually incorporated the terms of the submissions into its own order. *See* text at 17 *infra.*

**16.** *See Liddell v. Board of Education,* No. 72–100C(4) (E.D.Mo.1981) (H(150)81, a three-page memorandum in support filed by the SSD; and H(166)81, a twenty-five page memorandum in support filed by the United States).

erroneous. However, the parties being desirous of implementing a solution to the issues concerning paragraph 12(b) of the May 21, 1980 order without the expense of litigation, have agreed to the entry of the decree, and the Court being of the opinion that the entry of this decree will effectuate federal law * * *

The City of St. Louis, the United States, the Caldwell plaintiffs-intervenors, and the Special School District support the consent decree without equivocation. The Board of Education of the City of St. Louis supports the decree in accordance with the funding order entered on May 21, 1981. The State has executed the consent decree and approves the vocational plan, but is critical of the funding order. The Liddell plaintiffs approve the plan, but withheld approval of the consent decree, questioning the adequacy of the jurisdictional statement in the first paragraph. The intervening plaintiffs, Adams, object to the plan and the decree.

Although the district court expressed reluctance to enter an order and judgment as a "consent decree" because the Adams group objected to the parties' 12(b) agreement, it expressly adopted the vocational education plan, which had been agreed to by seven of the eight parties, "as its [the district court's] plan to desegregate the vocational schools in the City of St. Louis and St. Louis County." The court simply appended the parties' 12(b) plan, in its entirety, to its June 11, 1981, order and specifically made the plan a part of that order. The district court also held that the parties' vocational education plan was fair, reasonable and adequate under all the circumstances and that it satisfied constitutional standards. It "adopt[ed] the [parties' vocational education] plan as its own" and ordered the SSD, the St. Louis City Board of Education and the State of Missouri to implement the plan. The district court's June 11, 1981, order to which the parties' vocational education plan was attached also contains various other provisions, but only those directly relevant will be subsequently discussed.

(b) *Challenges to District Court's Vocational Education Orders.*

We previously held that the Adams group may challenge the 12(b) plan adopted by the district court because that group never endorsed the underlying consent decree and consistently preserved their objections to the parties' 12(b) plan. *Liddell IV,* slip op. at 5–6. We also allowed the state to "argue whether the financial obligations imposed upon it with respect to the vocational education plan are inconsistent with our previous mandates." *Id.* at 6. We dismissed the attempts by the state and SSD to escape their endorsement of the underlying consent decree and 12(b) plan. *Id.* at 4–6. Therefore, this part of the opinion involves two major issues: (1) the validity and constitutional sufficiency, on the merits, of the parties' consent decree and 12(b) plan which was adopted by the district court, and (2) the correctness of the district court's 12(b) funding orders.

We have carefully reviewed the May 21, 1981, consent decree drafted by the parties, compared it with the district court's June 11, 1981, order and conclude that the latter order adopted the consent decree without significant modification. The June 11, 1981, order tracked the consent decree's format throughout, but also: (1) added certain quotations from previous court opinions; (2) fleshed out and updated the procedural history culminating in the consent decree and 12(b) plan; (3) discussed the general legal principles applicable to consent decrees; (4) held that the 12(b) plan was fair, reasonable, adequate and constitutionally sufficient; (5) ordered the SSD, city board and state to file an interim progress report by July 15, 1983; and (6) added various funding provisions. These changes and additions, along with several nonsubstantive editorial changes made by the district court, simply were not significant. Therefore, the parties which consented to the entry of judgment via their endorsement of the consent decree have "no status to appeal." *Stanford v. Utley,* 341 F.2d 265, 271 (8th Cir. 1965). *See also Liddell IV,* slip op. at 5–6 (and citations therein).

Having so concluded, we turn to the Adams group's substantive challenges to the merits of the 12(b) plan.[17] Basically, the Adams group contends that implementation of the 12(b) plan will not desegregate the predominantly black city vocational schools and the predominantly white SSD. They argue that rather than being concrete, the 12(b) plan is merely "a letter of intent to try to work out details at a later date." The Adams group asserts that the Metropolitan Coordinating Committee (MCC), which, under the 12(b) plan, would be created and given primary responsibility for enforcing the plan's desegregation requirements, would be actually answerable to no one and be a "toothless tiger" without any real power to effectuate constitutionally required desegregation of the metropolitan area vocational programs.

The Adams group cites numerical statistics which purportedly reveal that "white families who are desirous of obtaining vocational education for their children [would be encouraged] to move out of the City into the suburbs." They contend that the plan's natural result will be to resegregate the St. Louis metropolitan area and that fewer students will have the opportunity to obtain vocational training than are currently enrolled in such programs. Finally, the Adams group argues that the plans' contemplated yearly desegregation goals for vocational educational programs[18] will be impossible to achieve.

As an alternative, the Adams group urges us to adopt a 12(b) plan which would simply merge both vocational systems by ordering the state to dedesignate the city board as the "area vocational school" (AVS) for the city and to designate the SSD as the AVS both for city and county.[19] It is argued that a single vocational system under one vocational district could best desegregate the vocational programs currently being separately operated by the SSD and city board.[20] We note that in so arguing, Ad-

17. Various parties argue that the Adams group lacks standing to challenge the 12(b) plan. In light of the group's 1977 intervention and consistent participation in all phases of this litigation to date, we cannot agree.

18. The 12(b) plan establishes the following specific racial distribution goals: *Year One* (1981–1982)—85% white and 15% black in Special District Technical Schools. *Year Two* (1982–1983)—(1) 82% white and 18% black in Special District Technical Schools; (2) initiate unduplicated programs at the city's O'Fallon Technical High School with a goal of 65% white and 35% black, but allowing a ten percentage point differential either way; (3) open the new West County Technical School and initiate unduplicated programs with racial goals of 65% white and 35% black, but allowing a ten percentage point differential either way; and (4) 10–15% white and 85–90% black at O'Fallon. *Year Three* (1983–1984)—(1) 78% white and 22% black in Special District Technical schools; (2) 50% white and 50% black at O'Fallon; (3) initiate three additional unduplicated programs with goals of 65% white and 35% black, but allowing a ten percentage point differential either way; and (4) 50% white and 50% black in O'Fallon's new tenth grade Occupational Orientation magnet program for city students. *Year Four* (1984–1985)—(1) 75% white and 25% black in Special District Technical schools; and (2) 65% white and 35% black at O'Fallon. *Year Five* (1985–1986)—The 12(b) plan's ultimate goal is to have a racial balance of 65% white and 35% black (allowing a ten percentage point differential either way) at each of the four technical schools in existence then—North County Technical, South County Technical, West County Technical and O'Fallon Technical. The plan also provides that it is certainly permissible to attain the ultimate 65%/35% goal earlier than is contemplated in the initial five-year period.

Other provisions of the plan, such as the establishment of at least seven community-based vocational programs by Year Four (1984–1985) do not have specific racial distribution goals.

19. The term "area vocational school" (AVS) is a term of art because the Missouri State Board of Education is authorized to "designate" area vocational schools. Such designation makes the AVS eligible for significant additional financial support to serve vocational needs. Vocational education training in Missouri is delivered at comprehensive high schools, junior colleges and area vocational schools; an AVS is defined as that part of a school district which has been designated by the State Board of Education to provide vocational education for its students and students from other specified school districts.

20. The Adams group also argues that costs and attorneys' fees should be assessed against the parties which submitted the 12(b) plan adopted by the district court. We reject this contention.

ams ignores the fact that a complete merger of the SSD and city board's vocational systems could be ordered under the express terms of the 12(b) plan if the plan fails to effectively desegregate the metropolitan vocational technical schools by the end of the 1985–1986 school year.[21]

We do not find the Adams group's objections persuasive. First, we do not accept the contention that the 12(b) plan is an agreement to do nothing. The plan mandates a specific yearly progression of events which will result in a racial balance of sixty-five percent white and thirty-five percent black [22] at each of the vocational technical schools which will be operating by the 1985–1986 school year. These goals and the various provisions of the 12(b) plan satisfy constitutional standards. The MCC will have extensive responsibilities and authority in ensuring that the plan is implemented and its goals reached. For example, the MCC has the power to eliminate duplication of programs and may assign students to particular vocational technical schools.

Second, the district court's June 11, 1981, order and 12(b) plan contain various reporting and monitoring provisions. These provisions ensure that the anticipated progress will be made. In addition, the district court expressly retained jurisdiction over the vocational education issues and may take appropriate action at any time sua sponte or upon a motion of any party if implementation of the 12(b) plan does not bring about the anticipated results. Also, and as briefly noted earlier, paragraph sixteen of the 12(b) plan states that the district court, after the 1985–1986 school year and upon a party's motion after a hearing, "may either order a complete merger of the vocational programs with a unified governing and taxing structure, modify this plan, or adopt any other plan * * *."

Third, the parties having responsibilities under the 12(b) plan must exercise those responsibilities with the utmost good faith. The parties' negotiations which resulted in the consent decree and 12(b) plan are commendable. We trust that actual desegregation of the vocational education programs in the metropolitan area will be achieved with the same cooperative spirit.

(c) *The District Court's Paragraph 12(b) Funding Orders.*

In our December 2, 1981, order, we allowed the state to "argue whether the financial obligations imposed upon it with respect to the vocational education plan are inconsistent with our previous mandates." *Liddell IV*, slip op. at 6. The district court's finding that the state was constitutionally culpable for failing to disestablish the dual vocational education systems in the city and county[23] was affirmed by this Court and the United States Supreme Court denied the state's petition for writ of certiorari.[24] Under the law of the case doctrine, this finding of culpability must be followed in all subsequent district and appellate proceedings. *See, e.g., Continental Bank & Trust Co. v. American Bonding*, 630 F.2d 606, 608 (8th Cir. 1980); *Houghton v. McDonnell Douglas Corp.*, 627 F.2d 858, 864 (8th Cir. 1980).

The district court's June 11, 1981, order provided that funds to meet the commitments of the state defendants to the 12(b) approved plan shall be made available by the state defendants.[25] The court expressly

---

**21.** In addition, these considerations are distinct from a more fundamental reality: the broad remedial authority vested in the federal courts under the Supremacy Clause to eliminate proven constitutional violations committed by the state.

**22.** The plan expressly allows for a ten-point percentage differential either way. While some flexibility is necessary in such planning, the 65% white/35% black goal is a realistic one and should be attained. *See also* n.18, *supra*,

for a full description of the 12(b) plan's racial distribution goals.

**23.** *Liddell v. Board of Education*, 491 F.Supp. 351, 358 (E.D.Mo.1980).

**24.** *Liddell II*, at 650. *See* n.1, *supra*.

**25.** The district court actually considered vocational funding issues on four separate occasions. First, the district court signed a consent decree on May 21, 1981. H(132)81 (described *supra* at 16–17). Paragraph 6 of the decree

recognized that significant start-up costs, outlays for building renovation and additional operating expenses would be necessary to establish vocational programs in ninth and tenth grades at regular comprehensive city high schools.[26] It noted that there were unspent funds earmarked for the 1980–1981 St. Louis Desegregation Budget which had been provided by the state and by the federal government via the Emergency School Assistance Act (ESAA). Like its May 21, 1981, order, the court directed that one million dollars of the unspent state funds designated for St. Louis desegregation be placed in a separate account to be used for vocational education expenses. It again directed the city board to promptly apply to the United States Department of Education for permission to use previously designated ESAA funds to "fund costs for the development, equipment, renovation and operational costs for the City Board's vocational programs." The June 11, 1980, order also contained the following specific funding provisions:

> D. The Board of Education of the City of St. Louis shall reimburse the State [the one million dollars of state funds discussed above] * * *, spent to the extent that monies are available at the end of the 1981–82 school year from the City Board's Debt Retirement Fund which are not otherwise restricted by prior Court order or necessary for the retirement of the City Board's debt.

If the City Board has no such funds, the State shall continue to pay such costs from the [one million dollar account previously discussed] * * *.

> E. If the above funds are still insufficient to develop, equip, renovate and cover increases in operational costs for these programs which result from compliance with the plan and this decree, then the remainder of the unspent State designated monies existing in the 1980–81 Desegregation Budget shall be utilized as necessary.

> 11. [sic] During the phase out of ninth and tenth grade students from O'Fallon Technical High School to comprehensive high schools in the City of St. Louis, the State funding allocated for such programs during the school year of phase out shall be paid to the Board of Education of the City of St. Louis for vocational education related matters. Said funding to the City Board shall continue each year thereafter.[27]

> 12. The Court recognizes that the Special School District has previously budgeted two million dollars ($2,000,-000.00) [in new equipment] for equipping West County Technical High School which will open in Year Two of the 12b plan for consolidated vocational programs. Much of this equipment will be used at the discretion of the Metropolitan Coordinating Committee for unduplicated

provided that "[f]unds to meet the commitments of the State Defendants to the [12(b)] plan * * * shall be made available by the State Defendants and the Missouri General Assembly subject to and in compliance with any applicable provisions of law." Because the parties were unable to agree on how the plan would be funded, the district court entered a separate funding order on May 21, 1981. H(134)81. This second attempt to address funding issues was independently drafted by the district court and contained funding provisions that were substantially incorporated in the district court's third order, dated June 11, 1981. The district court entered the final vocational funding order that is relevant to our consideration on June 24, 1981, in response to the state defendants' motion to reconsider the previous funding orders. *See* text accompanying notes 29 & 30, *infra*.

**26.** Under the parties' 12(b) plan, the vocational technical schools will offer vocational training only for grades eleven and twelve. As a result, vocational training presently offered for grades nine and ten at O'Fallon Technical High School would be eliminated and vocational programs for those grades would be merged into "comprehensive" high schools in the City of St. Louis. "Comprehensive" high schools are regular curriculum high schools not designated or operating specially as "vocational schools."

**27.** The final sentence of paragraph 11 initially stated: "State defendants have agreed to this provision." On June 24, 1981, the district court deleted this sentence and added the following phrase: " * * * * under the desegregation order or modifications thereof." *Liddell v. Board of Education*, No. 72–100C(4), slip op. at 3 (June 24, 1981) (H(207)81).

programs under the consolidated program plan.[28]

13. All costs concerning the implementation of the vocational programs shall be subject to review by this Court if any party disputes any of these costs as not being reasonable or necessary for the implementation of this order.

14. In the event that the Board of Education of the City of St. Louis is unable to fund the development, equipment, and/or renovation costs and to cover increases in operational costs for these programs which result from compliance with the plan and this decree from the above sources or with current desegregation budgeted revenues, the Board of Education of the City of St. Louis shall apply to the Court for such appropriate orders as may be necessary to secure additional funds essential for such purposes.

The district court also retained jurisdiction of the 12(b) aspects should further vocational-related orders—funding or otherwise—become necessary.

Finally, on June 24, 1981,[29] following a hearing held on June 23, 1981, the district court partially revised its June 11 order in response to the state defendants' motion to "reconsider * * * [the district court's] funding order dated May 21, 1981." In the fourth order, the court considered the state defendants' objections to the May 21, 1981, order, harmonized the May 21, 1981, funding provisions with those in the June 11,

1981, order and made certain minor modifications to its June 11, 1981, funding provisions.[30]

After careful review of these four 12(b) vocational education funding orders, we hold that the district court did not abuse its discretion in entering the funding provisions of the various orders. This Court has previously held that the state committed an interdistrict constitutional violation by failing to dismantle the racially segregated separate vocational programs in the SSD and city school districts.[31] The state's contention that this previous determination is not an adjudication of interdistrict liability for the vocational aspects of this case is without merit. The district court may, therefore, impose 12(b) funding orders against the state.

In affirming the district court's 12(b) funding orders, we note that the state had ample opportunity to contest the need for and reasonableness of the contemplated vocational costs.[32] In the future, it should participate fully in the budgetary process involving the vocational programs.

(3)(a) *Joinder of Suburban Districts and County Units of Government.*

On August 24, 1981, in H(337)81, the district court added eighteen St. Louis County suburban school districts and three St. Louis County governmental officials as parties defendant to this litigation.[33] The dis-

28. The phrase "in new equipment" bracketed in the quotation above was added by the district court on June 24, 1981. *Liddell v. Board of Education,* No. 72–100C(4), slip op. at 4 (June 24, 1981) (H(207)81).

29. H(207)81.

30. *See* notes 27 & 28, *supra.*

31. The Missouri State Board of Education simply could have designated the SSD as the AVS for the entire St. Louis metropolitan area by adding the city school district to the SSD's vocational service area.

32. At oral argument, counsel for the Adams group contended that the average cost of the 12(b) plan per student will be $60,000, compared to pre-plan cost of $2,800 per student. This argument ignores the fact that a portion of the city board's proposed 1981–1982 vocational

budget ($1,394,840 out of a total proposed vocational budget of $2,400,147) would be spent for capital outlay. It seems apparent that many of the capital expenditures would pay for the phase out of ninth and tenth grade vocational training at O'Fallon Technical High School and the implementation of vocational training for those two grades at the city's comprehensive high schools. Obviously, many "start up" costs would require a single capital outlay which would not be required in subsequent years. In any event, the district court will consider the Adams group's per-student cost claim when it considers the city board's proposed 1981–1982 vocational budget.

33. The Pattonville School District was added as a party defendant in H(337)81 but later agreed to participate in the paragraph 12(a) voluntary interdistrict pupil transfer plan. As a result, the district court subsequently stayed motions

trict court also stayed various motions to add several other suburban school districts and other entities as parties defendant. Finally, the district court ordered the state defendants and city board to develop and submit a suggested plan of interdistrict school desegregation pursuant to paragraph 12(c).[34]

Several parties appealed from H(337)81 and, in response, others filed motions to dismiss those appeals for lack of appellate jurisdiction. On December 2, 1981, we concluded the validity and scope of paragraph 12(c) may be reargued but we expressly reserved ruling on the jurisdictional questions concerning the appeals from H(337)81. *Liddell IV*, slip op. at 7–8.

We now hold that we lack jurisdiction to entertain the appeals from H(337)81. The portions of the district court's order which added additional party defendants are not appealable. *Liddell IV* at 5 n.6 (and citation therein). The portions of H(337)81 which stayed certain proceedings pending before the district court—for example, the motions to add additional entities as party defendants—are also not appealable. *Id.* at 13 (and citation therein).

Many newly joined defendants argue that the interdistrict liability issues should be tried as an entirely separate lawsuit, claiming in part that beginning a new record is preferable to utilizing and adding to the large record already accumulated in this litigation. Similarly, the state, in arguing that the interdistrict issues should be tried separately, contends that joinder of so many more defendants to the original lawsuit will not foster judicial economy.

In contrast, the city board, which was recently aligned as a plaintiff in the interdistrict proceedings, asserts that the interdistrict liability issues would best be tried in a single lawsuit. All the plaintiffs in the interdistrict liability phase, however, claimed at oral argument that they only

wanted an opportunity to prove an interdistrict case against the defendants.

We must again stress that many orders entered by the district court are nothing more than matters of case management. The district court must manage this difficult litigation on a day-to-day basis and the parties must not file "premature and piecemeal interlocutory appeals which have no jurisdictional basis." *Liddell IV*, slip op. at 14. Although we lack jurisdiction to consider the challenges to H(337)81, we trust that part (3)(b) of this opinion will alleviate some of the recurring concern of the parties relating to interdistrict matters.

(3)(b) *The 12(c) Proceedings and Interdistrict Relief.*

Considerable controversy has arisen over the proper construction of paragraph 12(c) of Judge Meredith's order of May 21, 1980. This order was approved by this Court as originally entered[35] and as subsequently amended.[36] The amended paragraph 12(c) order reads in pertinent part as follows:

> [T]he State defendants and the St. Louis Board of Education shall prepare and submit to the Court a feasibility plan of interdistrict school desegregation involving the St. Louis school district and such suburban school districts, that will provide complete and lasting school desegregation. These considerations may apply to those suburban school districts which are not necessarily confined to the suburban districts located in St. Louis County but limited only by considerations of feasibility and practicality, including reasonableness of transportation times and distances. This feasibility plan should include educational and ancillary components such as those outlined in the Court of Appeals' opinion of March 3, 1980 in this case, and should specifically include pupil assignments and administrative reorganization provisions.

---

seeking to join Pattonville as a party defendant in the interdistrict liability proceedings.

**34.** Paragraph 12(c) is fully discussed in Part (3)(b).

**35.** *Liddell II*, at 650–51.

**36.** *Liddell III*, at 648–50.

Pursuant to this paragraph, four comprehensive plans for integrating the St. Louis schools and various suburban schools have been filed with the district court. Several appellants, especially the St. Louis County schools, governmental units and officials who have been joined as defendants, contend that the district court intends to implement these plans without first affording the suburban schools or governmental units that would be affected an opportunity to be heard and without first making findings of interdistrict liability. They base this view on a series of eight orders issued by the district court, and particularly two orders issued on September 24, 1981.[37] In those two September 24, 1981, orders, the district court used some language indicating it would "enforce a metropolitan desegregation remedy against the State and St. Louis County school districts as state instrumentalities."[38]

The state defendants contend that because all of the plans for integrating city and county schools would substantially affect the defendant county districts by consolidation of districts, realignment of school boundaries, or pairing of school districts, they cannot be ordered to implement such a remedy until and unless the county schools have been heard and a determination has been made that they have contributed to the segregation of city and county schools. They also argue that further hearings are required to establish whether they can be required to take any actions in addition to those they have already been required to take with respect to the city schools.

The Liddell appellants, on the other hand, assert that the State of Missouri has the ultimate and exclusive responsibility for public education in the state and that, inasmuch as it has been found to be a constitutional wrongdoer in segregating the public schools of the City of St. Louis, it can be required to realign city and county school boundaries and to require consolidation of these schools to further desegregation of both city and county schools without further hearings to determine the liability of the county school districts.

The Adams group, representing white parents and students of South St. Louis, also contend that the district court can order the State of Missouri to realign boundaries between city and county schools and to order consolidation of city and county schools if necessary to effectuate desegregation of the city schools. They, too, assert that it can take these actions without additional hearings or liability findings and cite as support *Morrilton School District v. United States*, 606 F.2d 222 (8th Cir. 1979) (en banc), *cert. denied*, 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980); *Evans v. Buchanan*, 582 F.2d 750 (3d Cir. 1978) (en banc), *cert. denied*, 446 U.S. 923, 100 S.Ct. 1862, 64 L.Ed.2d 278 (1980); *United States v. Board of School Commissioners*, 573 F.2d 400 (7th Cir. 1978).

The City of St. Louis takes the position that the district court orders are not reviewable under 28 U.S.C. §§ 1291 or 1292. It asserts that the appeals before the court in this category are "little more than invita-

---

**37.** H(336)81; H(337)81; ruling on motion H(341)81; rulings on motions H(409)81 and H(410)81; H(476)81; H(493)81; and H(494)81.

The orders designated as H(493)81 and H(494)81 were issued on September 24, 1981.

**38.** We do not reach the state's recurring argument that it cannot merge independent school districts because it lacks real control over those districts. This lack of control, argues the state, supports its view that local school districts are not its "instrumentalities." In support of this argument, the state places primary reliance on *England v. Eckley*, 330 S.W.2d 738 (Mo.1959) (en banc); *State v. Holmes*, 231 S.W.2d 185 (Mo.1950) (en banc); and Mo.Const. art. III, § 40.

Regardless of whether the state's arguments have any validity, both Judge Meredith and this Court assured the suburban school districts that they would be given an opportunity to be heard before any imposition of a mandatory interdistrict desegregation remedy. We honor those assurances. Many suburban school districts are now party defendants in this litigation and the interdistrict liability issues will be determined after a full liability hearing. The district court may, if it deems necessary, reach the state's "instrumentality" arguments in the interdistrict liability proceedings. We need not at this time address the merits of the interdistrict proposals before the district court.

tions to this Court to issue a declaratory or advisory opinion concerning the interdistrict aspects, if any, of the case below." They urge us to reject the parties' invitation to use 28 U.S.C. § 1651 as a vehicle to control interlocutory decisions of the district court and subvert the express federal policy against piecemeal litigation.

There is a great deal of merit to the arguments advanced by the City of St. Louis. The district court has yet to issue an order that impacts any of the county schools or units of government. Thus, we are being asked not to rule on a specific plan but to anticipate what the district court may have in mind and to instruct it as to what it can or cannot do. The most that can be said is that the district court has indicated in one or more of its orders that it may take actions which impact significantly on St. Louis County school districts. While the city board is not opposed to such action as a matter of principle, it fears that either this Court or the United States Supreme Court will find that the action taken is inconsistent with the Supreme Court's decision in *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), and that as a result, meaningful interdistrict relief will be delayed for years.

The State of Missouri and the county defendants, on the other hand, are opposed to interdistrict relief as a matter of principle. They assert that they have not been found to have contributed to the segregation of either city or county schools and that unless and until they have been found to have done so after a hearing in which they have had an opportunity to participate, no orders requiring them to take any action with respect to integrating either city or county schools can be taken.

We have no desire to interject ourselves into the management and direction of this case by the district court. That is not our responsibility. We have no wish to take any action which will encourage constant interlocutory appeals, and we do not intend to issue advisory opinions whenever one or more of the parties feels that the district court is about to take a step with which

they disagree. We, therefore, hold that we are without jurisdiction to consider the various appeals from the district court's severance order. *See* 9 Moore's Federal Practice ¶ 110.13[8], p. 183 (1980).

In light of the fact that our earlier opinions with respect to paragraph 12(c) may have led to some confusion, we will, however, restate the position of this Court. We do so in order that the process of integrating the St. Louis city schools can continue without interruption and so that the plaintiffs below can obtain a prompt determination of their claim that an interdistrict remedy is appropriate here.

Paragraph 12(c) permitted the district court to require the defendants who have been adjudged to be constitutional wrongdoers—the state defendants and the city board—to prepare and submit feasibility plans for interdistrict desegregation involving city and suburban schools in a way that will provide complete and lasting school desegregation.

Four major plans now have been submitted. Three of them are broad in scope and would, in essence, establish a single integrated school district consisting of the present city district and a number of suburban districts, the number depending on the particular plan. The new district would be divided into areas for administrative purposes, with students assigned and transported where necessary to achieve a thoroughly integrated school system. The state's plan is essentially one calling for cooperation between school districts.

It is clear from our earlier orders that the broadly based plans cannot be implemented in the context of the present 12(c) proceedings.

It is equally clear, however, that the district court can require existing defendants—the state and the city school board—to take the actions which will help eradicate the remaining vestiges of the government-imposed school segregation in the city schools, including actions which may involve the voluntary participation of the suburban schools. For example, the district court could (1) require the state and the city to

take additional steps to improve the quality of the remaining all-black schools in the City of St. Louis; (2) require that additional magnet schools be established at state expense within the city or in suburban school districts with the consent of the suburban districts where the schools would be located; (3) require that additional part-time programs be established at state expense to provide for more integrative experiences for students in all-black city schools, including programs which would involve voluntary participation by suburban schools; and (4) require the state to provide additional incentives for voluntary interdistrict transfer.[39] Such relief would not materially affect parties that have not been found constitutionally liable and, hence, would be permissible under paragraph 12(c).

There is thus no sound reason why the 12(c) hearings should not go forward promptly and why the district court should not determine what actions it can require the state or the city board to take which may involve the suburban schools.

The record also reveals other innovative ideas and techniques that the district court may consider. Their feasibility and cost can be explored in the evidentiary hearings which have already been scheduled and which can be completed promptly. Many of these ideas and techniques require cooperation by the suburban schools, others do not. To the extent that suburban schools are willing to cooperate, the plans requiring their participation can now go forward. To the extent that they are unwilling to do so, the 12(c) plans must be tailored to be effective without their mandated participation. We emphasize that suburban schools that voluntarily participate will not by such participation admit liability or waive any right that they may presently have to be excluded from a plan of mandatory interdistrict desegregation.

In the interests of judicial economy, we suggest that the interdistrict liability proceedings previously severed from the remainder of the case be postponed until after the district court has entered an order in the pending 12(c) proceeding. The interdistrict liability aspect should then proceed promptly thereafter.

*(4) Recusal.*

On September 24, 1981,[40] Judge Hungate denied several motions by county schools and other county defendants to disqualify himself from presiding in this case. Specifically, he declined to recuse himself "as to proceedings related to the original lawsuit, including the implementation of remedial plans pursuant to paragraphs 12(a)–(d) * * *." He did, however, recuse himself "as to the claims of interdistrict constitutional violations" which were presented in various pleadings filed by leave of the district court. In making these rulings, he specifically held that the moving parties' affidavits,[41] which alleged that he had predetermined the interdistrict liability issues, were "clearly insufficient" to warrant recusal under 28 U.S.C. §§ 144 and 455. Nevertheless, he recused himself "from determination of the alleged constitutional violations by the county school districts as individual entities" so that "disposition of this complex litigation may proceed in an atmosphere of calm reflection."

Several parties appealed from this partial recusal order and, in response, others filed motions to dismiss those appeals for lack of appellate jurisdiction. On December 2, 1981, we concluded that the various appeals

---

**39.** These possible remedies are given as examples only. They are not intended to represent an exhaustive list. The district court may adopt other remedies that are appropriate.

**40.** H(494)81.

**41.** The following parties filed separate motions, along with various pleadings, memoranda and affidavits, to disqualify Judge Hungate: (1) St. Louis County and its individually named offi-cials; (2) Riverview Gardens School District; (3) Mehlville School District; (4) Affton School District; (5) Maplewood-Richmond Heights School District; (6) Jennings School District; (7) Brentwood School District; (8) Bayless School District; (9) Hancock Place School District; (10) Lindbergh School District; (11) Ladue School District; (13) Rockwood School District; and (14) Webster Groves School District.

from H(494)81 "arguably" fell within our appellate jurisdiction and allowed them to proceed with a specific reservation of the jurisdictional issues until after briefing and oral argument. *Liddell IV*, slip op. at 9 & 9 n.12. We now hold that we lack jurisdiction to entertain the appeals from the H(494)81 order.

█ A district judge's determination "*not* to disqualify himself is reviewable by appeal only from a final judgment in the cause in which the motion for disqualification was filed." *Scarrella v. Midwest Federal Savings and Loan*, 536 F.2d 1207, 1210 (8th Cir.) (per curiam), *cert. denied*, 429 U.S. 885, 97 S.Ct. 237, 50 L.Ed.2d 166 (1976) (emphasis added). Such a determination, however, is reviewable by a petition for a writ of mandamus and we may, as we choose to do so here, treat an allegation on appeal as such a petition.

We turn then to the question of whether we should issue a writ of mandamus to require Judge Hungate to disqualify himself. In *Pfizer, Inc. v. Lord*, 456 F.2d 532 (8th Cir.), *cert. denied*, 406 U.S. 976, 92 S.Ct. 2411, 32 L.Ed.2d 676 (1972), we held that mandamus may be utilized to review a district judge's refusal to recuse himself. We also reviewed the standards for recusal. *Id.* at 537. In *United States v. Poludniak*, 657 F.2d 948 (8th Cir. 1981), we again reviewed the standards for recusal, this time in the light of 28 U.S.C. § 455(a) as amended in 1974, which provides: "Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

█ On the basis of a careful review of the record, we find no basis to direct Judge Hungate to recuse himself from the original proceedings. The substance of the movants' claims is that Judge Hungate decided in advance of any evidentiary hearings that the county schools and county defendants would be required to participate in a mandatory interdistrict plan for desegregating the county and city schools. They essentially base this allegation on two statements made by the judge and two orders issued by him.

On April 1, 1981, Judge Hungate stated:

If I may, in an aside, talk about the different sections we have—12(a)'s, 12(b)'s, 12(c)'s; we have voluntary or mandatory:

In World War II, WWII, the big one, you could volunteer. Some of us had that opportunity. You could volunteer to go to the Air Force. If you volunteered, they would put you there. You could volunteer for the National Guard. You could volunteer for the Navy. Some of us didn't do that. Later we were drafted, and we were placed in the infantry. You'd be surprised at what great interest the sergeant would have in what you would then like to volunteer for. Now the reception was not too good at that time. I hope that's helpful.

On May 20, 1981, he reportedly stated in substance:

We all have bosses and the Eighth Circuit is mine. I have to do what they say and if enough people do not participate with [sic, in] the voluntary plan, I will have to enter a mandatory plan.

On August 24, 1981, Judge Hungate issued an order (H(337)81) which read in part as follows:

In light of the overwhelming rejection of the 12(a) voluntary plan, the Court is compelled to begin proceedings on a mandatory inter-district plan pursuant to paragraph 12(c) * * *. On February 13, 1981, the United States Court of Appeals for the Eighth Circuit affirmed this Court's power to order a mandatory inter-district remedy.

\* \* \* \* \* \*

[T]he State defendants * * * and the St. Louis Board of Education are ordered and directed as follows:

To develop and submit to the Court by February 1, 1982, a suggested plan of inter-district school desegregation necessary to *eradicate the remaining vestiges of government-imposed school segregation in the City of St. Louis and St. Louis County.* [Emphasis added.]

On August 25, 1981, he issued another order (H(340)81) which directed the court-appointed experts:

To provide expert assistance to this Court in developing *and implementing* a mandatory, interdistrict desegregation remedy pursuant to paragraph 12(c) of Judge Meredith's order dated May 21, 1980, as amended, and as affirmed by the United States Court of Appeals for the Eighth Circuit. [Emphasis added.]

He further ordered as follows:

IT IS HEREBY ORDERED that the educational experts appointed by the Court on August 1, 1981, H(285)81, be and they are directed to begin assembling data necessary for devising *a mandatory interdistrict remedy pursuant to paragraph 12(c) for presentation to the parties for implementation in the 1982–83 school year.* IT IS HEREBY FURTHER ORDERED that on or before September 7, 1981, the experts shall file a proposed timetable for outlining the broad parameters of a 12(c) mandatory interdistrict plan. The framework shall be submitted to the Court before the expiration of their 90-day appointment, November 16, 1981. [Emphasis added.]

Certainly the orders cannot serve as a basis for recusal. Judge Hungate was complying with paragraph 12(c) of Judge Meredith's order which has been approved by this Court. The Supreme Court declined to review our decision approving paragraph 12(c). Even if it is assumed that Judge Hungate was reading more into 12(c) than either Judge Meredith or this Court intended, such a reading does not indicate any prejudice on Judge Hungate's part and, is not grounds for recusal.

Nor can the oral statements made during the course of the 12(a) proceedings serve as a basis for recusal. At most, they indicate a view on his part that if a successful voluntary plan could not be put together, he would be required to enter a mandatory plan at some date in the future: whether before or after an evidentiary hearing for the affected suburban schools is not clear. In sum, the orders and statements do not indicate any personal prejudice on his part but, instead, are simply an expression of what he considered his duty to be. *See, e.g., Cleveland v. Krupansky,* 619 F.2d 576, 578–579 (6th Cir.) (per curiam), *cert. denied,* 449 U.S. 834, 101 S.Ct. 106, 66 L.Ed.2d 40 (1980); *In re International Business Machines Corp.,* 618 F.2d 923, 927–932 (2d Cir. 1980); *Davis v. Board of School Commissioners,* 517 F.2d 1044, 1049–1052 (5th Cir. 1975), *cert. denied,* 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976); *United States v. Anderson,* 433 F.2d 856, 860 (8th Cir. 1970). For all these reasons, we decline to issue a writ of mandamus to overrule Judge Hungate's refusal to disqualify himself from the original proceedings.

In addition, we hold that we lack jurisdiction to entertain challenges to that portion of H(494)81 in which the district judge recused himself as to the interdistrict liability issues of the case.[42] *See Hampton v. Chicago,* 643 F.2d 478 (7th Cir. 1981) (per curiam) (a district court's order granting a motion to recuse is neither appealable nor subject to mandamus review because a litigant does not have a cognizable interest in having a particular judge sit in his case).

This is a very difficult case and emotions run high. The issues involved here, unfortunately, have been politicized by some public officials and candidates for public office. Every determination entered by the presiding judge has been, and will continue to be, seized upon by someone to advance his own interests. Thus, prudence, caution and fairness is necessary. We are confident that Judge Hungate has these qualities and that his only aim is to see that the constitutional rights of those affected are vindicated. Chief Judge Wangelin may, if he chooses to do so, reappoint Judge Hungate to preside in the interdistrict liability phase if Judge Hungate would be willing to reassume exclusive control over this complicated case.

42. As noted more specifically above, the district judge recused himself from considering the interdistrict liability issues concerning the county suburban school districts. The recusal order presumably is equally applicable to the potential interdistrict liability of the original defendants and the other newly added defendants in this litigation.

## CONCLUSION

We once again remand this cause to the district court for further proceedings consistent with this opinion.

The Special School District of St. Louis County and the State of Missouri shall equally bear all costs relating to the appeals which raised issues relating to vocational education. With this exception, each party to these appeals shall bear its own costs.