567 F.Supp. 1037 (1983)
Craton LIDDELL, et al., Plaintiffs,
v.
The BOARD OF EDUCATION OF the CITY OF ST. LOUIS, STATE OF MISSOURI, et al., Defendants.
No. 72-100C(3).
United States District Court, E.D. Missouri, E.D.
July 5, 1983.
*1038 *1039 William P. Russell, St. Louis, Mo., for Liddell.
Michael J. Hoare, St. Louis, Mo., for Caldwell.
Kenneth C. Brostron, Lashly Caruthers Baer & Hamel, St. Louis, Mo., for Bd. Educ. City of St. Louis.
Larry R. Marshall, Sp. Asst. Atty. Gen., Columbia, Mo., for State defendants.

MEMORANDUM
HUNGATE, District Judge.

I.
This matter is before the Court, following a fairness hearing, to determine whether a proposed Settlement Plan is fair, reasonable, and adequate for the resolution of the 12(c) interdistrict phase of this school desegregation case. The Settlement Plan is offered *1040 by the Liddell plaintiff class, the Caldwell plaintiff class, and all the school districts in St. Louis City and St. Louis County, Missouri.[1]
In 1980, defendant Board of Education of the City of St. Louis (City Board) and State of Missouri defendants were found liable for the establishment and maintenance of a racially segregated public school system within the City of St. Louis, in violation of plaintiff class members' constitutional rights. Adams v. United States, 620 F.2d 1277 (8th Cir.) (en banc), cert. denied, 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980); Liddell v. Board of Education, 491 F.Supp. 351 (E.D.Mo.1980), aff'd, 667 F.2d 643 (8th Cir.), cert. denied, 454 U.S. 1081, 1091, 102 S.Ct. 634, 656, 70 L.Ed.2d 614, 629 (1981). To remedy this constitutional violation, in 1980 the district court (Meredith, J.) ordered the implementation of a mandatory intradistrict desegregation plan within the City of St. Louis public school system, and the development and submission of plans involving voluntary interdistrict transfers between suburban school districts and the St. Louis City school district. Liddell, supra, 491 F.Supp. at 353-54, as amended by Orders dated September 17, 1980, and December 19, 1980. To date, the Court has approved and certain parties have implemented two interdistrict transfer plans (the 12(a) voluntary plan and the 12(b) vocational education plan). In the present 12(c) phase of this case, the Court is considering the implementation of a third interdistrict transfer plan.
A more complete history of this lengthy litigation is found in the appendix of this opinion. Its consideration is essential to a thorough understanding of the background of this decision. Its import is incapable of compression into a newspaper headline, a radio bulletin, or a thirty-second TV spot. At the same time, its complete inclusion in the body of this opinion would submerge the answers to the deceptively simple questions which are presently determinative of this phase of the litigation.
Should the Agreement in Principle, submitted by the plaintiffs and twenty-two of the twenty-three suburban school districts, be approved?
Should the Settlement Plan,[2] submitted by the plaintiffs and twenty-one of the twenty-three suburban school districts, be approved as fair, reasonable, and adequate, and as not inconsistent with the Agreement in Principle?
The answer to both of these questions is, "Yes."
All but one of the twenty-three St. Louis County school districts joined in the Agreement in Principle when first submitted. That one district, Riverview Gardens, later approved the Settlement Plan, thereby ratifying the Agreement in Principle. This made approval of the Agreement in Principle unanimous by all twenty-three St. Louis County school districts. The Agreement in Principle and the Settlement Plan are accepted by all proponent plaintiffs.
Among the plaintiffs, only plaintiff-intervenors City of St. Louis and United States decline to join in this effort to settle the case. Recent months find them reluctant either to litigate or to settle.
*1041 Six years ago, the City of St. Louis and the United States each sought and obtained leave to intervene as plaintiffs in this case, then already five years old. See City's renewed motion to intervene, dated July 7, 1977, granted by order dated July 13, 1977; United States' motion to intervene, filed and granted August 10, 1977. After attaining plaintiff-intervenor status, for four years both parties actively participated in the numerous proceedings of this case at both the trial and appellate court levels. Yet, in the present 12(c) phase, the City of St. Louis joined in the State defendants' motion to dismiss the City as a party in these proceedings. Moreover, the United States, although opposing State defendants' efforts to dismiss it as a party in this phase, has persistently refused to disclose clearly its position regarding the pending claim until the conclusion of the evidence. See, e.g., United States' responses to discovery requests, H(1466)82 at 1-2, dated October 12, 1982; H(1488)82 at 2, dated October 18, 1982; H(1515)82 at 3, dated October 20, 1982; H(1528)82 at 4, dated October 25, 1982; deposition of the United States, transcript dated November 30, 1982 at 14, 58-59; order requiring disclosure "with particularity" of United States' position, H(1871)82, dated December 29, 1982; statement of United States in response to order, H(1926)83, dated January 10, 1983. Now, while endorsing the concept and some portions of the proposed settlement, these two plaintiff-intervenors do not approve certain provisions of the proposal.
Since all twenty-three of the St. Louis County school districts approve the Agreement in Principle, along with the proponent plaintiffs, their further agreement to the Settlement Plan would not be necessary, except insofar as its proposals may be inconsistent with the Agreement in Principle. After duly considering the pleadings, exhibits properly admitted in evidence, public comments filed, and the testimony adduced in a five-day fairness hearing, this Court finds the Settlement Plan is not inconsistent with the Agreement in Principle.
After having unconditionally accepted the Agreement in Principle, two of the twenty-three St. Louis County School Districts, Rockwood and Mehlville, proposed additional conditions upon their entry into the Settlement Plan. They made it clear they did not oppose the Settlement Plan, and Rockwood has consistently reiterated that it is a proponent of the Settlement Plan. Since the Court finds the Settlement Plan is not inconsistent with the Agreement in Principle, to which all St. Louis County school districts have agreed, and since further expressions of agreement were not required, these two districts' conditions are approved insofar as they are not inconsistent with the Agreement in Principle and the other provisions of the Settlement Plan, to which twenty-one of the twenty-three St. Louis County school districts have agreed. Thus, Rockwood and Mehlville are also members in good standing of the Settlement Plan.
If Mehlville or Rockwood, or both, wish to litigate this issue further, they shall so notify this Court in writing by July 11, 1983, and the trial of the 12(c) liability of either or both of said school districts wishing to contest the matter shall begin July 25, 1983.
Expensive adversary trials ultimately deny justice to countless deserving people. This litigation has already consumed eleven years, and absent a settlement promises to consume many more. Society's greatest opportunities lie in encouraging human inclinations toward compromise, rather than stirring our tendencies for competition and rivalry. If lawyers, educators, and public officials do not help marshall cooperation and design mechanisms that promote peaceful resolution of conflicts, we shall miss an opportunity to participate in the most creative social experiments of our time. "A Flawed System," by Derek C. Bok, Harvard Magazine, May-June, 1983, at 38-71.
The Court commends the school officials and attorneys in this case, including the amicus curiae, Shulamith Simon, and the Special Master, D. Bruce La Pierre, along *1042 with the educational and religious leaders of this community, all of whom must receive full credit for bringing us to what has been called the threshold "of an historic settlement like none other achieved in this country, and far beyond the wildest dreams of the participants: a settlement agreement which would set the standards by which all other desegregation plans would be measured; a settlement agreement which would bring to an end on an amicable voluntary basis, 11 years of emotional, complicated and sometimes divisive litigation." Opening Statement of the State of Missouri defendants, Transcript of Fairness Hearing, May 13, 1983, at 6.
Finding parties, as diverse as those present here, reaching such a degree of unanimity as has been achieved by the proponent plaintiffs and the twenty-three St. Louis County school districts, would give any court pause before disapproving the efforts of these parties to find a voluntary solution to a complex constitutional problem in which legal, educational, political, and financial problems are inextricably entwined.

II.
Having found the Settlement Plan is not inconsistent with the Agreement in Principle, the next question presented is whether the Settlement Plan is fair, reasonable, and adequate and constitutionally sufficient.
(A) Pursuant to Fed.R.Civ.P. 23(e), the Court may only approve a class action settlement that is fair, reasonable, and adequate. Grunin v. International House of Pancakes, 513 F.2d 114, 123 (8th Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975). The Court must also insure that the terms of the agreement meet constitutional standards. See Liddell v. Caldwell, 546 F.2d 768, 773-74 (8th Cir. 1976), cert. denied, 433 U.S. 914, 97 S.Ct. 2987, 53 L.Ed.2d 1100 (1977). In reaching its decision on the proposed agreement, the court may not decide unsettled issues in the case. Grunin, supra 513 F.2d at 123-24. Furthermore, the Court must balance the public interest in favor of settlement against the interests of class members and the public as a whole. Armstrong v. Board of School Directors, 616 F.2d 305, 312-14 (7th Cir.1980).
In Grunin the United States Court of Appeals for the Eighth Circuit specified that a district court determines the adequacy of the settlement by considering:
(1) the strength of the merits of plaintiffs' case balanced against the resolution offered in settlement;
(2) the complexity, length, and expense of further litigation;
(3) the amount of opposition to the proposed settlement; and
(4) defendants' overall financial ability to pay.
Grunin, supra at 124; Manual for Complex Litigation, § 1.45 at 56 (5th ed. 1982).
Other factors the Court may consider include:
(5) the presence of collusion in reaching the settlement;
(6) the opinion of competent counsel as to the settlement's fairness and adequacy;
(7) the class members' reaction to the settlement; and
(8) the stage of the proceedings and the amount of discovery completed in the case.
3B Moore's Federal Practice ¶ 23.80[4] at 23-521 through 23-524.
(1) The Strength of Plaintiffs' Case Balanced Against the Resolution Offered in Settlement. By their interdistrict claims, City Board and Caldwell assert that defendants perpetuated and expanded, with "segregative intent" and "segregative impact," a metropolitan-wide racially dual public educational system that was created pursuant to state constitutional and statutory authority before the United States Supreme Court decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 *1043 (1954). City Board and Caldwell further contend that named defendants have not met their claimed post-Brown duty to dismantle this racially dual interdistrict educational system. In support of their allegations, these plaintiffs would seek to show student assignment patterns, faculty salary differences, governmental funding decisions, discriminatory housing and land use policies, and failures or refusals to consolidate school district boundaries, among other acts or omissions by defendants. As a remedy for the alleged constitutional violations, City Board and Caldwell seek:
(a) declaratory relief that defendants' acts and conduct are "unconstitutional and unlawful;"
(b) injunctive relief for the development and implementation of a remedial plan; and
(c) an award of attorney's fees and expenses.
With regard to the injunctive relief, these plaintiffs would seek consolidation of all St. Louis County, Jefferson County, and St. Charles County districts and the City of St. Louis district into five districts and would seek extensive student reassignment and transportation as necessary to achieve complete school desegregation. See, e.g., Report of the Board of Education of the City of St. Louis. Pursuant to Paragraph 12(c) of the Court's order dated May 21, 1980, as amended, dated November 16, 1981; Final Report on 12(c) Plan filed by City Board on February 10, 1982. They would also seek desegregation of teacher faculties, creation of uniform curricular and other educational standards, and the initiation of special educational programs, including magnet schools.
The St. Louis County school districts, as well as other defendants, denied the alleged constitutional violations and would have presented evidence in an attempt to show: that a metropolitan-wide racially dual public educational system never existed; that if such a system ever existed it had been fully dismantled; that after Brown each county school district had established a unitary school system; and that the remedy sought by plaintiffs would not have been supported by the violations, if any, that might have been found.
Without explicitly addressing the school districts' alleged liability, the proposed Settlement Plan provides for:
(i) voluntary interdistrict transfers of students, with specified ratios and goals for the racial balance of student populations in participating districts;
(ii) a hiring and transfer program, with specified goals for the racial balance of administration and teaching staff of participating districts;
(iii) the establishment of specialized educational programs, including: programs focused on the all-black schools remaining within the City of St. Louis; magnets; part-time programs; and cooperative programs with paired schools and with local cultural, civic, and business institutions;
(iv) provisions to insure equitable treatment of all students;
(v) one administrative body to coordinate and review implementation of the programs;
(vi) various enforcement and grievance procedures; and
(vii) an award of reasonable attorney's fees to City Board, Liddell, and Caldwell plaintiffs.
Thus, although the Settlement Plan does not presently resolve the City Board's and Caldwell's request for declaratory relief or their allegations of defendants' liability, the Settlement Plan provides proponent plaintiff class members with immediate, extensive opportunities to receive a quality education in a broad range of desegregated settings throughout the St. Louis metropolitan area.
(2) The Complexity, Length, and Expense of Future Litigation. At present there are three remedial plans already approved and implemented in the metropolitan area:

*1044 (a) the intradistrict plan within the City of St. Louis only;
(b) the 12(a) voluntary plan providing for interdistrict transfers among the City and fifteen St. Louis County school districts; and
(c) the 12(b) vocational education plan providing for interdistrict transfers between the vocational programs of the City and those of the Special School District of St. Louis County.
This phase of the eleven-year-old lawsuit involves:
(i) two certified plaintiff classes;
(ii) seven "active" St. Louis County school district defendants against which discovery is complete, pretrial materials are filed, and trial may proceed;
(iii) ten St. Louis County school district defendants that are subject to stay orders due to their participation in the 12(a) voluntary plan;
(iv) five St. Louis County school districts that have not yet been served as defendants due to a stay order entered upon their participation in the 12(a) voluntary plan from its inception;
(v) one St. Louis County school district that has not yet been served as a defendant due to a stay order entered in consideration of the district's unique status as a product of a prior court-ordered desegregation plan of consolidation of three school districts; and
(vi) several other parties who are prepared for trial, i.e., State of Missouri defendants; St. Louis County government defendants; plaintiff-intervenor City of St. Louis, etc.
Plaintiffs could immediately go to trial against only seven St. Louis County school districts, and would at least have to seek to lift or vacate stays and pursue discovery efforts before going to trial against the other sixteen St. Louis County school districts. Absent the Settlement Plan, there is doubt that such a broad remedy could be imposed by the Court until all school districts had an opportunity to be heard in a 12(c) liability hearing. Thus, if the Settlement Plan is not approved, plaintiffs must proceed against distinct sets of St. Louis County school districts in order to litigate fully the pending 12(c) interdistrict claims.
In contrast to this potentially prolonged judicial process, the Settlement Plan promises immediate and broad implementation of its programs since it is proposed by the proponent plaintiffs, City Board, Liddell, and Caldwell classes, and all twenty-three St. Louis County school districts, regardless of their status as "active" or non-active parties or as nonparties.
The history of this case, moreover, shows the parties' propensity to appeal decisions of this Court. Since the parties are not unanimous in their participation in this Settlement Plan the Court doubts that approval of the Settlement Plan will foreclose appeals at this stage of the case. The Court, however, determines that, with approval of the Settlement Plan, there will be a reduction in the number and scope of any appeals, as well as immediate implementation of the proposed programs pending resolution of the appeal process.
(3) The Amount of Opposition to the Proposed Settlement. To express any opposition to the proposed Settlement Plan, interested persons could either file written comments or appear in person at the fairness hearing. In addition to proponents' presentation at the fairness hearing, the Court heard testimony and oral statements from eleven non-party individuals who expressed opposition to the plan, with nine of those appearing on behalf of organizations.
State defendants and plaintiff-intervenor City of St. Louis also presented evidence in opposition to the proposed Settlement Plan.
Additionally, the Court received forty-two written statements from interested individuals and organizations, including statements from some of those who presented statements at the fairness hearing. Some of the statements filed were joined in by several individuals.
*1045 In considering the extent of opposition, the Court must view the agreement in its entirety, rather than isolating individual components of the agreement for analysis. Armstrong, supra, 616 F.2d at 315. The settlement, moreover, is a product of compromise efforts by adversaries. Usually neither side will attain all of its goals in such a settlement. The Court must respect the terms derived from the parties' negotiations as long as the agreement does not violate constitutional standards and is found adequate, reasonable, and fair. See Armstrong v. Board of School Directors, 471 F.Supp. 800, 805, 812-13 (E.D.Wis.1979), aff'd, 616 F.2d 305 (7th Cir.1980).
The amount and type of opposition expressed against this Settlement Plan is not overwhelming in light of the scope and notoriety of this lawsuit. Many statements are thought-provoking and informative. Others seem to misinterpret:
(a) the voluntariness of the Settlement Plan, which contains no court-imposed student or staff reassignments, transportation requirements, district consolidations, or school closings, to name just a few of the court-mandated remedies available if the requisite interdistrict liability is found;
(b) the scope of and issues addressed by this phase of the lawsuit, which phase focuses on interdistrict school desegregation as it affects court-determined segregation within the City's public schools, and which does not focus on employment discrimination, housing problems, or on alleged intradistrict violations within other districts; or
(c) the constitutional desegregation principles, which as yet do not focus solely on improving the quality of education in existing one-race schools.
The Court has considered all statements presented by members of the public and understands that those not associated on an ongoing basis with this prolonged and complex case might misapprehend certain points.
(4) Defendants' Overall Financial Condition and Ability to Pay. While a customary factor to consider in determining the adequacy of a proposed settlement, defendants' ability to pay is not a relevant factor in determining whether or not to approve a class action settlement in a school desegregation case. Armstrong v. Board of School Directors, 471 F.Supp. 800, 805 (E.D. Wis.1979), aff'd, 616 F.2d 305, 326 n. 31 (7th Cir.1980).
(5) The Presence of Collusion in Reaching the Settlement. The Court may analyze the agreement and the negotiating process to determine whether the agreement is unfair because of fraud or collusion. Here there is no contention by any Settlement Plan participant or by any objector that collusion exists to taint the proposed Settlement Plan.
Certain parties, who are not signatories to the Settlement Plan, and a nonparty teachers' union have expressed chagrin at their absence from the negotiating process that resulted in the Settlement Plan. See, e.g., Proposed Findings of Fact and Conclusions of Law filed by the City of St. Louis on June 1, 1983; Motion to Intervene filed by teachers' union Local 420 on April 18, 1983.
The City of St. Louis did not complain in any manner when the State defendants sought to dismiss the City as a party in this phase of the case. See Motion to Dismiss the United States, Craton Liddell, et al., and the City of St. Louis as Parties Plaintiff in the Inter-District Phase of the Litigation, filed by State defendants on May 10, 1982. In fact, the City explicitly joined in the State defendants' motion to dismiss the City as plaintiff-intervenor. The Court denied that motion and the City of St. Louis remained as a plaintiff-intervenor in the 12(c) phase of this case. As a party participant, the City of St. Louis opposes particular provisions of the proposed Settlement Plan.
With regard to the teachers' union, Local 420, it did not seek party status in this case *1046 until April 18, 1983. Granted leave to file as amicus curiae, Local 420 has intermittently presented its position on various issues throughout the course of this litigation. Recently, the Court denied the union's motion to intervene, and has permitted the filing and consideration of statements submitted by Local 420 regarding the proposed Settlement Plan.
No party complaining of exclusion from any negotiating session has timely sought relief from the Court on this question. The Court views with some degree of skepticism those who wait until two are out in the ninth inning before complaining that they were not asked to name the starting pitcher.
Assuming such exclusion is unusual in multiparty, complex litigation, the Court fails to see how such absence, in and of itself, constitutes collusion or fraud to render a proposed agreement unfair or unreasonable. In this case, moreover, the negotiating process was not initiated or, for the most part, conducted by the parties alone. The Court appointed a nonparty Special Master "to explore the possibility of settlement." This diligent and competent Special Master was assisted in his efforts by a court-appointed Amicus, representing the public interest. The presence of these persons throughout the major part of the negotiating process renders any suggestion of possible collusion or fraud less tenable than in other settlement situations.
(6) Opinion of Competent Counsel. In support of the Settlement Plan, counsel for proponents submitted an affidavit, acknowledging their familiarity with the record in the case, the parties' positions in this phase, and the Settlement Plan's terms. In their opinion, the proposed Settlement Plan is a fair, reasonable, and adequate resolution of this phase of the case.
Although the Court may not delegate to counsel the Court's duty and responsibility to determine the adequacy of a proposed agreement, the Court may consider competent counsel's opinion. Armstrong, supra, 616 F.2d at 325. Here, the great majority of proponents' counsel have been involved in this case since at least the filing of the interdistrict claims three years ago. All counsel appear to the Court thoroughly familiar with their clients' positions, skilled to conduct this litigation in a competent manner, and knowledgeable of the record of the case and applicable law.
Thus, the Court considers and gives some weight to counsel's opinion, although it is not dispositive and is only one of the several factors considered by the Court in passing on the Settlement Plan's adequacy.
(7) Class Members' Reaction to the Settlement. Both white and black members of the classes have participated in these proceedings and some have objected to particular aspects of the proposed Settlement Plan.
Furthermore, at the fairness hearing, Minnie Liddell and Dr. James DeClue, two of the named plaintiffs, acknowledged they had reservations regarding certain provisions of the Settlement Plan but, as an aspect of compromise, they had determined other benefits gained by the Settlement Plan rendered it fair, reasonable, and adequate.
All of the objections have been considered by this Court. The Court recognizes that not all members of the class would approve the proposed settlement. If the Court would not approve the Settlement Plan without unanimous agreement of the class members, then it could never approve a settlement in this case.
The Court may approve a fair settlement over objections by some or many class members, and even despite criticism by some named plaintiffs. Armstrong, supra, 471 F.Supp. at 804, aff'd, 616 F.2d at 326. Here, the number of objectors is not undue in the circumstances of this case, given its extensive notoriety, the many thousands of plaintiff class members, the importance of the plaintiffs' claims, and the nature of the litigation. The amount of *1047 opposition by class members and members of the community here is comparable to that in Armstrong where forty-five persons testified at the fairness hearing and many others submitted written statements, "most to express their dissatisfaction with the settlement," which was ultimately approved as fair. Armstrong, supra, 616 F.2d at 326.
(8) Stage of the Proceedings and the Amount of Discovery Completed. The Settlement Plan was proposed after extensive discovery was completed and pretrial materials, including synopses of witnesses' testimony, were submitted on behalf of both plaintiff and defendant parties in this phase of the case. Furthermore, both plaintiff and defendant proponents have submitted summaries of the evidence they had intended to offer if this phase of the case proceeded to trial. Also, this phase of the case follows the determination of the State's and City Board's liability for segregated conditions within the City's public schools, and implementation, with appellate court approval, of a mandatory intradistrict remedial plan and two voluntary interdistrict plans.
(B) In light of the voluminous record, prior court orders, and the information derived from the fairness hearing and public statements regarding the Settlement Plan, the Court finds there is sufficient information available to determine the fairness, reasonableness, and adequacy of the Settlement Plan.
After considering each of the relevant factors set forth above, the Court finds the proposed Settlement Plan is fair, reasonable, adequate, and constitutionally permissible.

III.
Must the Settlement Plan be approved without alteration? Yes, except insofar as the Court finds technical, perfecting, and non-substantive changes necessary and reasonable. Cf. Liddell v. Board of Education, 677 F.2d 626, 634 (8th Cir.), cert. denied, ___ U.S. ___, 103 S.Ct. 172, 74 L.Ed.2d 142 (1982). For instance, as a result of the fairness hearing and subsequent documentation, it developed that
(a) $133,837.17 proposed for the 1983-1984 Settlement Plan budget duplicated amounts proposed in the 1983-1984 intradistrict budget; and
(b) $246,221.92 proposed for the After-School program was erroneously included as a duplication within the Settlement Plan budget itself; and
(c) $20,000.00 proposed for bus passes for students attending the as yet nonexistent alternative high school was erroneously included in the Settlement Plan budget. No one could reasonably contend that the Court should approve expensive errors acknowledged by parties to exist.
Of the Plan's twelve major components, Sections I, II, III, V, VI, VII, VIII, IX, XI, and XII are approved without substantive change.
Section IV on Quality Education, and Section X, dealing with Financing, will also be approved with the non-substantive changes noted in the following discussion. When considering quality education and financing, the Court is constantly mindful of two sometimes conflicting restraints:
(a) the Court cannot allow rights guaranteed by the Constitution to be derogated by the action or inaction of the legislative or executive branch;
(b) parties should not gain in Court that which they have legitimately lost in the legislature or at the ballot box.
The Court has considered the financial adviser's recommendations along with the comments filed thereon. The Court-appointed financial adviser, Dr. Warren Brown, recommends the creation of a small committee to approve "all activities, procedures, records and expenditures which are undertaken pursuant to provisions of the SA [Settlement Agreement]." Rather than require the establishment of yet another *1048 committee to provide an "approval procedure" under this Plan, the Court finds that such an "approval procedure" is implicit in the powers and responsibilities of the VICC and in the requirement that participants in this Plan exercise their rights and obligations in good faith. This good faith requirement includes efficient handling of the limited resources available to implement the programs, consideration of the quality and stability of implemented programs, and a responsibility to maintain monitoring, review, and accountability practices and procedures. To accomplish these implied requirements, the participants may decide to establish policies and procedures for the whole VICC, or may establish a standing or unrelated committee, or may delegate these functions to one or more staff or committee persons. School administration cannot be static. Flexibility is essential to success.
The financial adviser makes certain recommendations regarding the transition and initial activities of the VICC. To the extent these recommendations mirror several proposals of the Settlement Plan, they are approved.
On magnet schools, the adviser states, in part, that "activating new magnets for 1983-84 should be done deliberately and only after a rigorous needs assessment" (emphasis added). Section III of the Settlement Plan contains a review and approval procedure if plan participants seek to add to or expand listed magnets in school years after 1984-1985. The review and approval procedure does not explicitly apply to the new or expanded magnets proponents suggest for implementation in the 1983-1984 and 1984-1985 school years. The financial adviser's recommendation is well-taken. Noting that proponents do not mandate, but only suggest, that the listed magnets be created and/or expanded in the next school years, and recognizing the limitations of existing resources and the overall good faith requirement of plan participants, the Court directs plan participants to analyze and review the need of each expanded and new magnet proposed for 1983-1984 and 1984-1985 prior to the program's implementation. Plan participants should balance the need for and benefit of such magnets in light of programs already existing throughout the St. Louis metropolitan area, the need to coordinate recruitment efforts, and limited resources, among other factors.
As an alternative to the Plan's student transfer payment provisions, the financial adviser generally recommends that all state aid payments and trust fund allocations be sent to the student's home district and the home district pay a reasonable tuition to each host district receiving transfer students. This recommendation responds to State defendants' contention that the Plan's financing provisions might overcompensate participating school districts. The Court should insure stable and adequate participation in the Plan without providing an undue financial windfall to district participants. At this time, the Court deems the financing provisions reasonable and adequate to compensate districts for certain costs, particularly start-up costs, attributable to their implementation of this Plan, and will therefore approve the student transfer payment provisions of the Plan's financing section. The Court, however, recommends that the participants review the financial adviser's suggested alternative, as well as others, after some experience with implementation of the Plan.
The financial adviser generally endorses the State defendants' proposal to reduce transportation costs of interdistrict transfer students by zoning or "zipcoding" areas within which students are transported. In practice, this will limit the choice of schools available to transferring students from a given residential area. Because of the limit on student choice and the probable hindrance to school district participants' recruitment efforts, the Court does not approve a transportation plan that effectively limits student choice under the Settlement Plan. Despite the lack of approval for the suggested zipcoding system of transportation, *1049 the Court will commend any efforts the parties can make to reduce the costs of transportation, so long as opportunities for, and safety of, the students will not be compromised.[3]
In the Appendix to the Settlement Plan, and again in proponents' Exhibit 2, City Board specified programs for the "Improvement of the Quality of Education throughout the St. Louis public schools and Special Provision to Improve Instructional Quality in Non-Integrated Schools." The St. Louis County school district proponents stated that, although they, as well as other parties,
recognize the importance of the concept of the improvements of the quality of education in schools in the City of St. Louis and their responsibility to submit specific provisions concerning same to the Court[,] ... [t]hey do not have the necessary information about the city schools to form an opinion on the details of the Appendix and, therefore, they do not agree or disagree with all of the specifics in this basic design.
Despite this apparent lack of agreement on the programs listed in the Appendix and its companion Exhibit 2, those documents contain details of programs listed in other Settlement Plan sections, sections to which all proponents have agreed.
For example, Section V of the Settlement Plan, a section to which all proponents agree, contains proposals for the following part-time educational programs: "Pairing and Sharing," "Springboard to Learning," "The School Partnership Program," "Ethnic Heritage," "Radio Station KSLH," "English as a Second Language," "Honors Art," "Honors Music," and "Mass Media." Each of these enumerated programs is also listed in the Appendix and Exhibit 2.
This "double inclusion" situation is also true of the City magnets proposed as new or expanded programs for the 1983-1984 and 1984-1985 school years. The City magnets are listed in both Section III, to which all proponents agree, and the Appendix and Exhibit 2.
To the extent the programs in the Appendix and/or Exhibit 2 are agreed to by all proponents of the Plan, those programs may be immediately implemented in accordance *1050 with the terms of the relevant section of the Settlement Plan and any implicit conditions deemed applicable. The Court finds agreement by the proponent plaintiffs and all St. Louis County school districts on such programs, and the Court would expect them to be among the earliest implemented.
The rest of the Quality Education programs should be considered for implementation by the City Board as soon as the proper priorities can be established and plans coordinated for the interdistrict desegregation of schools and the establishment of quality education in the one-race schools remaining.
Pursuant to the financial adviser's recommendations, the Court directs the parties to focus on the following programs at an early date:

IMPROVEMENT OF STAFFING RATIOS
A301 Reduce pupil-teacher ratios to county average
A302 Restore art, music, and physical education staff
A305 Increase nursing and counseling services
A402 Expand opportunities for all-day kindergarten
A503 Expand and improve extracurricular athletic activities

SPECIAL PROGRAMS FOR NON-INTEGRATED SCHOOLS
B101 Lower pupil-teacher ratios
B102 Coordination of instructional and motivational programs
B201 After-school remedial and enrichment programs
B203 Summer educational experience
B205 Parents as teachers
B206 Peer tutoring
B208 Role model experiences
B301 Parent and staff seminars

SPECIAL INSTRUCTIONAL PROGRAMS
A403 Restore after-school tutorial program
A409 Gateway Summer Institute
A410 Student leadership
A501 * Honors Art and 4th R Gallery
A601 * Springboard to learning
A603 * Pairing and sharing program
A604 * School partnership program
C103 * First phase magnet school plan
* Programs so designated are approved by all proponents.

INSTRUCTIONAL SUPPORT SYSTEMS
A102 Curriculum supervision
A201 Upgrade library/media service
A202 Audiovisual services
A702 Establish a staff development unit

SCHOOL/COMMUNITY RELATIONS
A805 Strengthen school-parent-community communications and involvement
A806 Strengthen the capabilities of the public affairs unit

PLANNING AND DEVELOPMENT
A101 Curriculum development
A401 Develop and implement early childhood education program
A813 Desegregation planning and monitoring
A901 Improvement of the quality of school facilities
These enumerated programs should be analyzed and reviewed for immediate implementation, with "immediate" meaning within the 1983-1984 school year. City Board may give priorities to these programs so that some are implemented by September, 1983, some implemented by January, 1984, some before the end of the school year, and others in the 1984-1985 school year. As the financial adviser suggests, the foregoing priorities should be established and programs analyzed so as to maintain the stability and quality of implemented programs for participating students and to limit excesses that may "topple the [quality education] program" through "overload and waste."
*1051 By approving proponents' efforts to address and improve the quality of education within the City of St. Louis, the Court is not expressing either endorsement or disapproval of all the programs mentioned in the Appendix or Exhibit 2, nor is the Court intending to limit or preclude consideration of additional quality education programs.
The financial adviser also recommends that City Board complete a long-range study of its plant facilities. To the extent building and facilities improvements are part of the desegregation remedial effort, the Court endorses such long-range study and planning, especially in light of possible changes that may occur throughout the course of this remedial effort in student and staff populations, as well as regular and specialized educational programs. Thus, the Court accepts the present recommendation and directs the City Board to undertake such long-range analysis and planning as are reasonable and feasible. The Court notes that, in accord with the adviser's suggestion, the funding effort for these facility improvement efforts should come mainly from local revenues, with one-time assistance from the State due both to "unique conditions" within the City and the need to treat equitably all students throughout the St. Louis metropolitan area as part of this desegregation remedial effort.
The financial adviser next recommends the addition of four state supervisors in the metropolitan area to assist implementation of this Plan. The Court does not find such additional staff proposed as part of the Plan presented by proponents, and for that reason does not interject this as a prerequisite to implementation of the Plan. To the extent the State defendants and/or plan participants deem such additional staff advisable, they may consider this recommendation.
The financial adviser recommends that City Board undertake a management study, a particularly internal matter which should be addressed by the City Board, and the Court will not require such an undertaking as part of the interdistrict desegregation plan.
In the Settlement Plan, the parties recognize that successful implementation depends on a sound and equitable financing arrangement. Anticipated transfer of up to 15,000 students, major reductions in student-teacher ratios, development and expansion of magnet schools, renovation of antiquated facilities, and improvements in curricular offerings within the City schools, as well as other aspects of the Plan, will require substantial additional expenditure of funds for the education of public school children in St. Louis.
Estimates of first year costs range from $37,000,000[4] (financial adviser) to $87,000,000 (City School Board) to well over $100,000,000 (State defendants). Because of the wide divergence and lack of agreement of the estimates, the Court enters no findings or orders at this time regarding the amount of funds likely to be necessary for 1983-1984, except to note that it will be substantial and that difficult decisions will have to be made in order to obtain the necessary amount.
For twenty-nine years, black school children of St. Louis have been urging the fulfillment of the promise of constitutional equality. For twenty-nine years, Missouri has created new programs and expanded old ones with funds that should have gone to students whose constitutional rights have been violated. The constitutional responsibility must now be faced.
The primary responsibility for funding the Settlement Plan rests with those parties who have been adjudicated as liable under the Constitution for segregated conditions within the City's public schools  the State of Missouri and the Board of Education of the City of St. Louis. The sole purpose for *1052 the expenditure of funds under this Plan is to carry out the constitutional responsibility to remove the vestiges of a segregated school system. Thus, all proposed expenditures must be justified on this basis.
In no way should any funding provisions presently authorized by the Court be construed to authorize expenditures unrelated to City Board's desegregation obligations under the Constitution and the Settlement Plan as approved.
The Settlement Plan provides that the costs are to be shared by the State and the City school board through State funding of various programs and a tax rate increase in the City of St. Louis to be ordered by the Court. In securing the protection of constitutional rights, the Court's responsibility and power to implement a desegregation plan with a directive to increase taxes should be exercised only as a last resort and in a manner designed to assure that taxpayers are not overburdened. The Court has no desire to employ its equitable powers to fine or otherwise punish for contempt, so long as the necessity therefor can be avoided.
This Court has the authority to order the State of Missouri, which has already been adjudicated a primary constitutional violator in causing school segregation in the City of St. Louis, to fund the voluntary interdistrict transfers and improvements in the quality of education in the City schools provided for in the proposed settlement in order to further remedy the State defendant's constitutional violations. Liddell, supra, 677 F.2d at 629-30, 641-42. See also Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1972); Hills v. Gautreaux, 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976); Liddell, supra, 667 F.2d at 655; Reed v. Rhodes, 500 F.Supp. 404 (N.D.Ohio 1980), aff'd, 662 F.2d 1219 (6th Cir.1981), cert. denied, 455 U.S. 1018, 102 S.Ct. 1713, 72 L.Ed.2d 135 (1982). While the State claims it is experiencing financial constraints, it has not responded historically to the educational needs of its school age children. See Yaris v. Special School District of St. Louis County, 558 F.Supp. 545 (E.D.Mo.1983) ("... only one state in the Country appropriates less funds than the State of Missouri for its educational system").
This Court has the authority to order the City Board, already adjudged a constitutional violator, to increase its tax rate, if necessary, as contemplated by Section X(B)3 of the proposed settlement. Griffin v. County School Board, 377 U.S. 218, 233, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256 (1954); United States v. Missouri, 515 F.2d 1365, 1372-73 (8th Cir.), cert. denied, 423 U.S. 951, 96 S.Ct. 374, 46 L.Ed.2d 288 (1975). Accord Wichita Finance & Thrift Co. v. City of Lawton, 131 F.Supp. 788, 790 (W.D. Okl.1955); State ex rel. Martin v. Harris, 115 P.2d 80, 45 N.M. 335 (1941); Raynor v. King County, 2 Wash.2d 199, 97 P.2d 696, 708 (1940); City of Catlettsburg v. Davis' Administrator, 91 S.W.2d 56, 262 Ky. 726 (1936); Town of Flagstaff v. Gomez, 29 Ariz. 481, 242 P. 1003, 1004 (1926); City of Long Beach v. Lisenby, 180 Cal. 52, 179 P. 198, 200 (1919) (which hold that a court may raise the tax levy of a governmental unit even above state-imposed constitutional and statutory tax rate maximums in order to satisfy a judgment against the governmental unit for breach of an involuntary obligation). But see State v. City of Mound City, 335 Mo. 702, 73 S.W.2d 1017, 1024 (1934) (en banc). The authority to exercise such power may well be questioned when based on anything less than the protection of federally guaranteed constitutional rights. "State policy must give way when it operates to hinder vindication of federal constitutional guarantees." North Carolina State Board of Education v. Swann, 402 U.S. 43, 45, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971); see Haney v. County Board of Education, 429 F.2d 364, 368 (8th Cir.1970).
This Court has previously ordered the use of surplus revenues in the City Board's bond retirement account for funding of its *1053 1980 desegregation order, and the Court of Appeals has affirmed. Liddell, supra, 491 F.Supp. at 353; Liddell, supra, 667 F.2d at 655.
At this time, the Court declines to order a City Board tax rate increase beyond the rate imposed during the 1982-1983 year, but reserves the option to do so at a later date should City Board lack sufficient revenues or surplus so that Court action becomes necessary to prevent a denial of constitutional rights. The City Board would, of course, apply any surplus found on hand first to relieve itself of its status as a constitutional wrongdoer by alleviating segregated schools and providing improved quality education.
The financial adviser estimates new revenues for the City Board as follows:

Anticipated New Revenues
A. It is estimated that the City Board
 will experience revenue increases
 in 1983-1984, in addition to current
 local, county, and State
 sources, as follows:
 1. State sales tax (Proposition C)
 ($9,254,000 - 2,693,000) $ 6,561,000
 2. Home district incentive payments
 (3,000 × $550) 1,650,000
 3. Local revenue increase 1,100,000

In addition, an existing debt service levy of $0.17, scheduled to be retired in February, 1984, could support a new $20,000,000 bond issue amortized over twenty years without an increase in property taxes, according to this Court's financial adviser.
Finally, a recommendation by the proponents that the City Board be directed not to reduce its operating levy equal to one-half of sales tax revenues under the recently approved state-wide referendum (Proposition C), Mo.Rev.Stat. § 164.013, could generate an estimated $9,254,000, according to the financial adviser. See, e.g., Mo.Rev. Stat. § 164.013, providing that a property tax rollback not occur until school boards make "any other adjustments that may be required by any other law."
Assuming these estimates do not turn out to be overly optimistic, it is entirely possible that the City Board could have at its disposal in 1983-1984 more than $38,000,00 for implementing its share of the Settlement Plan without the necessity for increasing the current property tax rate within the City of St. Louis. The Court is aware these estimates assume that anticipated tax decreases of $0.17 (scheduled bond issue retirement) and approximately $0.58 (property tax rollback equal to one-half of sales tax revenues under Proposition C) will not occur as scheduled. The Court also notes that, pursuant to State law, a bond issue requires a two-thirds majority vote for passage.
Should a tax increase become necessary, available alternatives noted by the financial adviser include the following:

A. Increase the total rate by $1.71.
This was approved by 51% of St. Louis
voters in June 1982. $26,505,000
B. Increase the total rate by $1.83
to equal the average rate of St. Louis
County districts. 28,365,000
C. Increase City tax rates in three
funds to equal average adjusted, pupil-weighted
ratios in St. Louis County:
 1. Teacher Fund (65 cents more) 10,075,000
 2. Building fund (11 cents more) 1,705,000
 3. Debt service fund (12 cents more) 1,860,000

No one likes to pay the piper, but sooner or later it must be done. Mark Twain told the Public Education Association in 1900:
the [Russian] Government had decided that to support the army it would be necessary to withdraw the appropriation from the public schools. This is a monstrous idea to us. We believe that out of the public school grows the greatness of a nation.
It is curious to reflect how history repeats itself the world over. Why, I remember the same thing was done when I was a boy on the Mississippi River. There was a proposition in a township there to discontinue public schools because they were too expensive. An old farmer spoke up and said if they stopped the schools they would not save anything, because every time a school was closed a jail had to be built.

*1054 It's like feeding a dog on his own tail. He'll never get fat. I believe it is better to support schools than jails.
"Great American Speeches, 1893-1963," at 23, edited by John Graham, Meredith Corporation, copyright 1970.
The following financing plan shall be implemented:
1. The City Board shall certify to the Court, by July 15, 1983, the amount needed to meet its share of the costs of the Settlement Plan and the tax rate necessary to fund these costs along with its other obligations;
2. The City Board shall submit to the voters by February 1, 1984, a proposed bond issue of an amount determined by City Board as sufficient to meet the most pressing capital improvement needs of the City schools, as identified in Exhibit 2 as part of City Board's constitutional obligation to desegregate.
3. Should the bond issue fail to obtain the required two-thirds majority, the Court will consider an appropriate order to obtain the funds reasonably necessary to meet the capital expenditures incurred by City Board in meeting its constitutional obligation to desegregate.
4. The City Board is hereby authorized and directed not to reduce its operating levy in the City of St. Louis on July 1, 1983, as otherwise required by Mo.Rev.Stat. § 164.013 (Proposition C). The State shall not withhold from the City Board funds that the State would otherwise withhold pursuant to Mo.Rev.Stat. § 164.013. The amount of revenue retained by City Board by reason of not reducing its operating levy in the City of St. Louis pursuant to Mo.Rev. Stat. § 164.013 shall be utilized to fund programs under the Settlement Plan that are implemented to meet City Board's constitutional obligation to desegregate the City's public schools. Any revenue retained but not necessary to fund City Board's constitutional obligation shall be applied to reduce its operating levy on July 1, 1984.
5. In the event the above steps fail to raise the necessary funds to satisfy the City Board's share of the implementation costs, the Court will enter an appropriate order, following notice and an opportunity to be heard on the amount, to increase the property tax rate in the City of St. Louis by an amount necessary to fund the City Board's share of the costs of the Settlement Plan.

IV.

Conclusion
If we have been sufficiently honest and open-minded in recognizing our problems, and
If we have been sufficiently creative in conceiving new solutions, and
If we are now sufficiently purposeful in putting those solutions into effect,
We can reach our goals.
The history of American education is the long, turbulent record of a nation that was not afraid to risk failure or trouble or confusion in pursuit of a goal that at first seemed wildly impractical: to give every American child a chance to develop to the limit of his or her ability.
Life never was a series of easy victories. We cannot win every round or arrive at a neat solution to every problem. But driving, creative effort to solve problems is the breath of life, for a civilization or an individual. John W. Gardner, No Easy Victories, chapters 5, 12, 14, at 30, 67, 78 (1st ed. 1968).
"This [plan] is not perfect, but the sun has its spots, a diamond has its flaws, gold will not rust, and the good will shine through." Congressman Emanuel Celler, Brooklyn, New York, 1888-1981, (Member of Congress 1923-1973).

ORDER
A memorandum dated this day is hereby incorporated into and made a part of this order.
*1055 Having carefully considered the proposed Settlement Plan, the evidence duly received in support of and opposition to that Plan, public comments thereon, having considered the pertinent record in this cause, and being duly advised in the premises, it is hereby
ORDERED, ADJUDGED, AND DECREED that:
1. In accordance with the provisions of the memorandum, the Settlement Plan, including the Appendix and Exhibit 2, is hereby approved as fair, adequate, reasonable, and constitutionally permissible.
2. The Settlement Plan and its Appendix as revised by Exhibit 2, as approved, shall be implemented as of this date for the 1983-1984 school year, and all signatories, as well as State defendants, are required to comply with all the provisions thereof.
3. If the school districts of Mehlville and Rockwood wish to litigate rather than participate in the approved Settlement Plan, they, or either one of them, shall so notify the Court of this decision in writing by July 11, 1983, and, upon such written notification, their 12(c) liability phase trial is hereby scheduled to begin on July 25, 1983, at 10:00 a.m.
4. The State of Missouri and City Board shall share the costs of implementing the approved Settlement Plan, as more fully set forth within the Plan and this order.
5. Since allocation of costs is not specified within the Plan, those costs shared by City Board and the State of Missouri pursuant to the financing provisions of the Settlement Plan, Section X(B)(3), as approved, shall be allocated as follows:
(a) regardless of the program's or school's location, the State of Missouri shall pay in full the actual, reasonable costs of implementing the magnet programs and schools in Section III of the Settlement Plan, as approved, and in Section C of its Appendix and of Exhibit 2, Liddell v. Board of Education, 677 F.2d 626, 641-42 (8th Cir.), cert. denied, ___ U.S. ___, 103 S.Ct. 172, 74 L.Ed.2d 142 (1982);
(b) regardless of the program's location, the State of Missouri shall pay in full the actual and reasonable costs of implementing the part-time educational programs as identified in Section V of the Settlement Plan, as approved, and in Section B of its Appendix and of Exhibit 2, id.;
(c) except as noted concerning capital expenditures in paragraph 5(d) below, for other programs implemented pursuant to the Settlement Plan, as approved, City Board shall pay fifty percent of the reasonable actual costs of the programs implemented within the geographic boundaries of the City of St. Louis only, and shall not pay any costs incurred for programs implemented beyond the geographic boundaries of the City of St. Louis. The State of Missouri shall pay fifty percent of the reasonable actual costs of such programs implemented within the geographic boundaries of the City of St. Louis, and shall pay one hundred percent of the reasonable actual costs of programs implemented outside the geographic boundaries of the City of St. Louis;
(d) City Board shall retain the obligation and responsibility to fund capital expenditures needed to restore, repair, maintain, or enhance existing facilities as part of City Board's desegregation efforts. Any amount raised for capital expenditures by City Board through a voter-approved bond issue at any time during 1983-1984 shall be matched equally by the State of Missouri;
(e) the State of Missouri shall pay in full the costs of transportation of the interdistrict transfer students; the reasonable, actual costs to implement incidental programs, such as the student recruitment efforts, any community involvement centers, the Voluntary Interdistrict Coordinating Council (VICC) and its staff, the Recruitment and Counselling Center and its staff and offices, and parent involvement programs; and reasonable attorney's fees that may be awarded to the prevailing plaintiffs City Board, Caldwell, and Liddell.
6. For the payment of City Board's share of the costs:
*1056 (a) the City Board shall certify to the Court, on or before July 15, 1983, the amount needed to meet its share of the reasonable actual costs of implementing programs pursuant to the Settlement Plan, as approved, as well as the tax rate necessary to fund these costs;
(b) the City Board shall submit to its voters, on or before February 1, 1984, a proposed bond issue of an amount determined by the City Board as sufficient to meet those of its capital improvement needs as are deemed necessary to meet its constitutional obligation to desegregate the City's public schools;
(c) should that bond issue fail to obtain the two-thirds majority vote required by State law, the Court will consider an appropriate order to obtain the funds deemed sufficient to meet the capital improvement needs of City Board in complying with its constitutional obligation to desegregate the City's public schools;
(d) the City Board is hereby authorized and directed not to reduce its operating levy in the City of St. Louis as of July 1, 1983, as otherwise required by Mo.Rev.Stat. § 164.013 (Proposition C). The State shall not withhold from the City Board funds that the State would otherwise withhold pursuant to Proposition C. The amount of revenue retained by the City Board by reason of not reducing its operating levy shall be utilized to fund the implementation of programs needed to meet City Board's constitutional obligation to desegregate the City's public schools pursuant to the Settlement Plan, as approved. Any revenue retained but not necessary to fund City Board's constitutional obligation shall be applied to reduce its operating levy on July 1, 1984;
(e) in the event the above funding orders fail to provide the necessary funds, the Court will consider an appropriate order, following notice and an opportunity to be heard on the amount, to increase the City Board's property tax rate by an amount reasonably necessary to fund the City Board's share of the costs of implementing the Settlement Plan programs pursuant to City Board's constitutional obligation to desegregate the City's public schools; and
(f) in its discretion, City Board may use other sources available to it to fund its share of the programs implemented pursuant to the Settlement Plan, as approved. To conform this order with the prior decree of the Eighth Circuit, Liddell, supra, 677 F.2d at 631, any outside funds received by City Board for the purpose of implementing these programs may first be applied to reduce the City Board's share of the costs of the programs and then applied to reduce the State's share of the costs of the programs.
7. State defendants shall have discretion in the determination of the source or sources of the State funds with which to pay its share of the actual reasonable costs of implementing programs pursuant to the Settlement Plan, as approved, except to the extent that discretion is otherwise limited by the provisions of Section X of the Plan, as approved.
8. The State of Missouri shall separately pay transportation costs and the transfer student payments made to sending and receiving districts, as set forth in the Settlement Plan; and shall make its other payments in accordance with the provisions of order H(1810)82, dated December 17, 1982.
9. Each participating school district shall make a continuing effort to reduce the actual costs of implementing the Settlement Plan, as approved, without impairing the quality of the Settlement Plan's components.
10. Each participating school district shall have a continuing obligation to take all appropriate steps to secure and maintain any additional sources of desegregation assistance that may be available. If any participating school district obtains desegregation assistance from an outside source to fund a component of the Settlement Plan, as approved, the amount of such funding *1057 shall be deducted from the State's funding requirements under this order, except with regard to City Board's receipt of outside funds as detailed in paragraph 6(f) above.
11. For the effective and timely implementation of the Settlement Plan, as approved, the following budgeting procedure shall apply with regard to all actual and reasonable costs, except transportation costs and costs incurred for the student transfer payments made to sending and receiving districts, incurred pursuant to the approved Plan:
(a) each participating school district shall deliver to State defendants a proposed budget for all desegregation programs and activities intended for implementation pursuant to the Settlement Plan, as approved. These budgets shall be delivered to the State on or before July 15, 1983, for the 1983-1984 fiscal year. For subsequent fiscal years, the budgets shall be delivered to the State on or before March 1 of the preceding fiscal year;
(b) the budget for the VICC and for the Recruitment and Counseling Center (RCC) shall be filed with the Court and submitted to the State on or before July 25, 1983, for the 1983-1984 fiscal year. For subsequent fiscal years these budgets will be filed on or before March 1 of the preceding fiscal year;
(c) on or before July 25, 1983, representatives of the State and of each participating district shall identify in writing their areas of agreement and disagreement relating to budgetary matters. Since City Board has filed and the State has received the City Board's 1983-1984 budget (Exhibit 3, as corrected), representatives of the State and City Board shall meet and file their joint report on or before July 20, 1983. For subsequent fiscal years these statements of areas of agreement and disagreement relating to budgetary matters shall be submitted on or before March 15 of the preceding fiscal year. After completion of these efforts, the representatives may submit to the Court a joint statement of budgetary matters then remaining in dispute for the Court's consideration.
For fiscal year 1983-1984, the State shall submit in writing any objections to the budgets for the VICC and for the RCC within ten days of receiving those budgets. For subsequent fiscal years, representatives of the State and of the VICC and RCC shall identify in writing their areas of agreement and disagreement relating to budgetary matters on or before March 15 of the preceding fiscal year. After completion of these efforts, the representatives may submit to the Court a joint statement of budgetary matters then remaining in dispute for the Court's consideration;
(d) the Court's financial adviser may participate in the budget meetings between the State and the various representatives, and may present comments on the budgets to the Court either in writing directly, or at any subsequent hearing that may be required; and
(e) for the 1983-1984 fiscal year, any budget disagreements that remain, after the required meetings and reports, will be referred to United States Magistrate David D. Noce for a hearing on or before August 5, 1983. For subsequent fiscal years, the Court will consider any remaining disputed budget issues in a manner the Court deems appropriate.
12. The Court hereby stays further proceedings in this cause pursuant to Section XII of the Settlement Plan, as approved, except to the extent further proceedings may be required pursuant to paragraph 3 above.
13. Upon the establishment of the VICC, as described in Section IX of the approved Settlement Plan, the present Coordinating Committee for voluntary interdistrict school desegregation in the St. Louis metropolitan area shall terminate, and the 12(a) voluntary plan shall be dissolved. The VICC shall acquire all property and assume the obligations and administrative responsibility for all existing programs under the 12(a) voluntary plan in accordance with the provisions of Section IX of the approved Settlement Plan.
*1058 14. Since they are prevailing parties as to this phase of the case, plaintiffs City Board, Caldwell, and Liddell are granted leave until August 30, 1983, to file any claim for fees and costs, together with time sheets, affidavits, and any necessary supporting documents for the Court's consideration. Any pending issues regarding attorney's fees arising from discovery or otherwise in this phase of the case shall be dealt with at that time.
15. All pending Fairness Hearing motions and objections not heretofore ruled or otherwise dealt with herein are herewith denied.
Neither these parties nor this judge can delegate the powers of the federal court to enforce constitutional rights. The Court retains jurisdiction of this matter.

APPENDIX A

I. Intradistrict Phase

In 1972, Liddell plaintiffs, on behalf of black children eligible to attend or attending the City's public schools, as well as their parents, initiated this lawsuit as a class action against the Board of Education of the City of St. Louis (City Board). Liddell alleged that the City Board and its administrators had "effected and perpetuated racial segregation and discrimination" in the operation of the public schools of the City of St. Louis in violation of plaintiffs' rights under the fourteenth amendment. The Court certified this plaintiff class by order dated October 3, 1973.
In 1977 the Court granted Caldwell representatives, including the NAACP, the Adams group, the City of St. Louis, and the United States leave to intervene as plaintiffs in this case. The Court, upon several parties' motion, also added the State of Missouri, the Commissioner of Education of the State of Missouri, and the State of Missouri Board of Education as parties defendant. In 1980, upon several parties' motion, the Court added as parties defendant: the Governor, the State Attorney General, the State Treasurer, individual members of the State Board of Education, the Commissioner of Administration of the State of Missouri, and the Special School District of St. Louis County.
In 1980, the City Board and State of Missouri were found liable for the establishment and maintenance of a racially segregated public educational system within the City of St. Louis, in violation of plaintiffs' constitutional rights. Adams v. United States, 620 F.2d 1277 (8th Cir.) (en banc), cert. denied, 449 U.S. 826, 101 S.Ct. 88, 66 L.Ed.2d 29 (1980); Liddell v. Board of Education, 491 F.Supp. 351, 357, 358, 359-60 (E.D.Mo.1980), aff'd, 667 F.2d 643, 654-55 (8th Cir.), cert. denied, 454 U.S. 1081, 1091, 102 S.Ct. 634, 656, 70 L.Ed.2d 614, 629 (1981). To remedy this constitutional violation, the district court ordered the implementation of a mandatory desegregation plan within the City of St. Louis public school system, with funding for implementation of this plan shared equally by City Board and State. Liddell, supra, 491 F.Supp. at 353. Additionally, the Court directed City Board and State defendants to develop and submit plans to alleviate the segregated conditions through interdistrict transfers between the City and suburban school districts. Id. at 353-54. See also Adams, supra at n. 25 and n. 27, 620 F.2d at 1294-95 and accompanying text, 1296 (noting expert's opinion that interdistrict transfers would result in most stable desegregation plan); Liddell, supra, 491 F.Supp. at 356 (noting district court's and parties' general agreement with the appellate court's finding that "based upon the evidence, an interdistrict remedy has the best chance of permanently integrating the schools in the metropolitan St. Louis Area"). In accordance with its 1980 remedial order, the district court has already approved implementation of two interdistrict plans:
(a) the 12(a) voluntary plan involving transfers among fifteen St. Louis County school districts and the City school district, *1059 with funding provided by the State alone, Order H(226)81, dated July 2, 1981, aff'd, Liddell v. Board of Education, 677 F.2d 626, 629-30 (8th Cir.), cert. denied, ___ U.S. ___, 103 S.Ct. 172, 74 L.Ed.2d 142 (1982); and
(b) the 12(b) vocational education plan involving transfers between the City school district and the Special School District of St. Louis County, with funding provided by the State, the Special School District, and City Board, Order H(181)81, dated June 11, 1981, aff'd, Liddell, supra, 677 F.2d at 632-39.
This litigation is now in the 12(c) interdistrict phase, which involves mandatory interdistrict efforts to remedy the segregated conditions found to exist within the City. With regard to this phase of the case, the United States Court of Appeals for the Eighth Circuit has recently stated that:
the district court can require existing defendants  the state and the city school board  to take the actions which will help eradicate the remaining vestiges of the government-imposed school segregation in the city schools, including actions which may involve the voluntary participation of the suburban schools. For example, the district court could (1) require the state and the city to take additional steps to improve the quality of the remaining all-black schools in the City of St. Louis; (2) require that additional magnet schools be established at state expense within the city or in suburban school districts with the consent of the suburban districts where the schools would be located; (3) require that additional part-time programs be established at state expense to provide for more integrative experiences for students in all-black city schools, including programs which would involve voluntary participation by suburban schools; and (4) require the state to provide additional incentives for voluntary interdistrict transfer.39 To the extent that suburban schools are willing to cooperate, the plans requiring their participation can now go forward.
39 These possible remedies are given as examples only. They are not intended to represent an exhaustive list. The district court may adopt other remedies that are appropriate.
Liddell, supra, 677 F.2d at 641-42.

II. The Interdistrict Litigation

By Order H(337)81, the Court permitted City Board and Caldwell to file their interdistrict claims and to add certain parties defendant. The added defendants include St. Louis County, certain St. Louis County government officials, and the following St. Louis County school districts: Affton, Bayless, Brentwood, Ladue, Lindbergh, Hancock Place, Hazelwood, Jennings, Maplewood-Richmond Heights, Mehlville School District R-9, Normandy, Parkway, Riverview Gardens, Rockwood, Valley Park, Webster Groves, and Wellston. The St. Louis County school districts of Clayton, Ferguson-Florissant, Kirkwood, Ritenour, Pattonville, and University City are subject to stay orders and have not been added as defendants at this time. The Court also stayed litigation as to St. Charles and Jefferson Counties, including each school district in those counties, and as to certain housing authorities. On September 24, 1981, the Court granted City Board's motion for realignment as a plaintiff in the interdistrict phase of the case only.
City Board's crossclaim and Caldwell's amended, supplemental, and cross complaint for interdistrict desegregation are similar. In general, they seek:
(a) declaratory relief that defendants' acts and conduct are "unconstitutional and unlawful,"
(b) injunctive relief for the development and implementation of a remedial plan, and
(c) an award of attorney's fees and expenses.
The pleadings assert that defendants perpetuated and expanded, with "segregative intent" and "segregative impact" a metropolitan-wide racially dual public educational system that was created pursuant to state *1060 constitutional and statutory authority before the United States Supreme Court decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). They further contend that named defendants have not met their claimed post-Brown duty to dismantle this racially dual interdistrict educational system. To support these contentions, the City Board and Caldwell pleadings point to student assignment patterns, faculty salary differences, governmental funding decisions, discriminatory housing and land use policies, failures or refusals to consolidate school district boundaries, among other alleged acts or omissions of defendants. Caldwell also alleged that it brought its claims on behalf of students and their parents within the metropolitan area.
For these claims, City Board and Caldwell define the "St. Louis Metropolitan Area" to include St. Louis City, St. Louis County, St. Charles County, and Jefferson County.[1] Since stay orders have been entered against St. Charles and Jefferson Counties and named defendants therein, the "St. Louis Metropolitan Area," as artificially defined for purposes of this case, is now limited to the geographic area encompassed by the boundaries of St. Louis City and St. Louis County. See Order H(337)81, dated August 24, 1981; see also H(1183)82, dated August 6, 1982; H(1985)83, at 4, ¶ 1, dated January 25, 1983. These plaintiffs assert that the causes of action arise from "the equal protection" provisions of 42 U.S.C. § 1983 and the thirteenth and fourteenth amendments; the "full and equal benefit" provisions of 42 U.S.C. § 1981 and the thirteenth amendment; the real property rights of 42 U.S.C. § 1982; and the protection afforded to federally funded programs by Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et seq.
The active defendants denied the alleged constitutional violations. Defendants would have presented evidence in an attempt to show: that a metropolitan-wide racially dual public educational system never existed; that if such a system ever existed it had been fully dismantled; that after Brown each St. Louis County school district had established a unitary school system; and that the remedy sought by plaintiffs would not have been supported by the violations, if any, that might have been found.
The class action issues in this phase of the case were referred to United States Magistrate David D. Noce pursuant to 28 U.S.C. § 636(b)(1)(A). After three days of hearings, the Magistrate recommended in relevant part that:
"(a) the NAACP amend its pleadings within seven days only to the extent necessary to satisfy standing requirements for an organizational plaintiff; if such amendment is not made, the NAACP should be dismissed as a plaintiff-intervenor for failure to satisfy the standing requirements;
(b) Lillie Mae Caldwell satisfies the standing requirements necessary to pursue this litigation as a plaintiff-intervenor; Minnie Liddell, Lois LeGrande and Samuel Yarber, as parents of children in the public school system, satisfy standing requirements to pursue this litigation as Liddell plaintiffs; the children of these remaining named Liddell plaintiffs should be substituted for the children on whose behalf these remaining Liddell plaintiffs were originally named as next friends;

*1061 (c) the Liddell class, as originally certified, may continue to prosecute this litigation; and
(d) the interdistrict claims set forth in the amended complaint of Caldwell plaintiff-intervenors, H(351)81, are properly maintained as a class action under Rule 23(a) and 23(b)(2). The District Court should certify the Caldwell class as comprising all students, and their parents, now attending or who will attend Missouri public primary and secondary schools located in the metropolitan St. Louis, Missouri area."
After due consideration for defendants' objections to Magistrate Noce's Report and Recommendation and for Caldwell's motion to amend its pleadings, filed in response to that Report and Recommendation, the Court adopted the Report on February 9, 1983, H(2085)83. Also in accordance with Magistrate Noce's recommendation, the proposed substitution of certain named representatives for the Liddell class was subsequently approved. H(2356)83, dated May 4, 1983.
Pursuant to the mandates of the United States Court of Appeals for the Eighth Circuit to proceed with interdistrict liability proceedings, and this Court's order of August 6, 1982, the Court set the 12(c) liability phase of this case for trial on February 14, 1983. As of February 14, 1983, the active St. Louis County school districts included Bayless, Hazelwood, Mehlville, Riverview Gardens, Rockwood, Valley Park, and Webster Groves. The other St. Louis County school districts were subject to stay orders. See, e.g., H(336)81, dated August 24, 1981; H(1365)82, dated September 17, 1982; and H(1978)83, dated January 20, 1983.
Prior to this first trial setting, the Court, sua sponte, appointed Professor D. Bruce La Pierre Special Master and director of a settlement conference program for this case only. Thereafter, settlement discussions took place. From time to time, at the request of the Special Master, joined by the parties, the Court postponed the trial scheduled for February 14, 1983, to provide the parties the opportunity to resolve their differences on the pending issues. On February 22, 1983, the settling parties submitted an Agreement in Principle which was approved at that time by each of the proponent plaintiffs and all St. Louis County school districts except Riverview Gardens. The Special Master subsequently, on March 30, 1983, filed a proposed Settlement Plan. By April 4, 1983, the Liddell, Caldwell, and City Board plaintiffs, twenty of the twenty-three St. Louis County school districts, including Riverview Gardens, and the St. Louis County defendants advised the Court of their unconditional acceptance of the Settlement Plan. One school district, University City, initially declined to sign the Settlement Plan, but accepted it on June 1, 1983. Two school districts, Mehlville and Rockwood, suggested conditions, and the question arises whether those conditions are inconsistent with the Agreement in Principle. Counsel for Rockwood and Mehlville have insisted that these districts are signatories to the Settlement Plan, have accepted that agreement, and are not seeking a modification of it. By their conditions, Mehlville and Rockwood desire either to advise the Court of particular concerns which each has, or to ask the Court to interpret certain parts of the Settlement Plan. The Court declines to give advisory opinions. The State of Missouri, the City of St. Louis, and the United States have advised the Court that they would not sign the Settlement Plan.
The proposed Settlement Plan is limited to the 12(c) phase of this litigation and does not include St. Charles and Jefferson Counties, against which plaintiffs' interdistrict claims have been stayed. See, e.g., H(336)81, dated August 24, 1981; and H(1365)82, dated September 17, 1982. The special education programs of the Special School District will be dealt with hereafter. The proposed Settlement Plan also does not involve the paragraph 12(d) housing issues and the housing defendants against which plaintiffs' claims have been stayed.

*1062 III. Fairness Hearing

On April 8, 1983, this Court scheduled a fairness hearing to begin April 28, 1983, at which evidence concerning the Settlement Plan was to be presented. The Court's order also provided for publication of notice to plaintiff class members of the proposed agreement and fairness hearing. The notice was published twice in each of thirteen newspapers having circulation throughout the St. Louis metropolitan area, and was sent by registered mail to each person or group who submitted written comments on the Agreement in Principle in compliance with the relevant Court order. The Court also required that a copy of the proposed Settlement Plan be made available to the public at each school within the St. Louis metropolitan area. In addition to the formal notice provided by this Court, the proposed Settlement Plan received extensive media coverage throughout the St. Louis metropolitan area (see Memorandum Decision filed April 28, 1983, with the Order of the same date, H(2343)83, and Exhibit 4 containing a collection of newspaper articles concerning the Settlement Plan). Judging from the public response as evidenced by both the participation at the fairness hearing and the submission of written comments, there was more than sufficient notice to and opportunity for interested citizens to be aware of the relevant issues and/or to convey their respective positions.
At the five-day fairness hearing, the Court heard from both proponents and opponents of the proposed Settlement Plan. The opposing evidence included eleven persons from the local community, some of whom presented statements on behalf of organizations. Furthermore, the Court received forty-two written statements regarding the proposed Settlement Plan from interested citizens and organizations. The Court granted parties until June 1, 1983, to file proposed findings of fact and conclusions of law and received four such pleadings.

APPENDIX B
We are all gravely concerned with the costs involved in coming into compliance with federal constitutional standards in the desegregation of schools. This concern should be placed in proper perspective.
In the book Inside U.S.A., written in 1947, John Gunther wrote of the resourcefulness with which Missourians can address educational problems:
"Negroes call Missouri a `southern state with northern exposure.' It was a slave state in 1860, and laws prohibiting intermarriage between black and white are on the books. Segregation is the rule in schools, theaters, restaurants, and hotels; on the other hand there is no Jim Crow in transportation. Conductors on southbound trains try, however, to persuade Negroes to sit in the same car, to save the trouble of moving them into a Jim Crow Coach when the South proper is reached.
"The most interesting over-all aspect of the Negro issue in Missouri is in education. The situation is moderately complex. The University of Missouri at Columbia refuses (like all southern state universities)[1] to admit Negroes. The University of Kansas at Lawrence, Kansas, does admit them. The University of Kansas City (Missouri) does not admit Negroes, nor does Washington [University] in St. Louis. St. Louis University (Catholic) does. At Jefferson City, some thirty miles from Columbia, is Lincoln, *1063 a state university exclusively for Negroes. In 1936 a Negro named Lloyd Gaines, on being graduated from Lincoln, applied for admittance to the University of Missouri law school. He was refused. He thereupon sued the university. The case reached the Supreme Court, which in 1939 made a[n] historic ruling, to the effect that the state of Missouri was obliged to give its citizens, white or Negro, equal educational facilities. But a loophole continued to exist, whereby the state could pay the tuition of a Negro at some institution outside the state, instead of admitting him to one of its own white schools; this is the reason why so many Missouri Negroes go to the University of Kansas. But the Gaines case made further action necessary. Missouri was forced to set up a branch of its law school for Gaines alone, in St. Louis!  in order that the campus at Columbia should continue to remain lily white. This must be the only case in history of a school designed for a student body consisting of one person. Gaines, however, did not appear in St. Louis to take up his unique position.
"Then a lively young girl named Lucile Bluford, at present on the staff of the Kansas City Call, applied for admittance to the University of Missouri school of journalism, which is incidentally one of the best in the nation. The registrar did not recognize her application as being from a Negro, and she was accepted. Then, when the school term opened and she arrived on the campus, she was promptly informed that she could not, of course, be admitted. Miss Bluford renewed her application, was refused, and then sued the university. To evade implications of the suit, the state then set up a separate school of journalism at Lincoln  which still exists  again with the intent of keeping, at all costs, any Negroes from infecting the home campus. This segregated school of journalism had only five or six students to begin with; yet it had to be specially maintained with a staff of teachers and the like. Miss Bluford, however, would not attend the ersatz school. It was set up for undergraduates and she was qualified to be a graduate student. So she applied for admittance to the university's graduate school. Again she was refused. So she filed another suit. Fearing to lose the suit, in which case it would have had to accept her, the university proceeded to abolish (temporarily) its own graduate school of journalism.
"Lest this whole episode appear purely incredible, as well as asinine, we should point out again that Missouri is a border state. When we reach the South it will become clearer why such monstrous procedures continue to exist." John Gunther, Inside U.S.A., ch. 22, pp. 354, 356-67 (1st ed. 1947).
NOTES
[1] Except the Special School District of St. Louis County, which has special jurisdiction over vocational and handicapped education in that County's school districts, and is to be dealt with hereafter.
[2] The Settlement Plan is repeatedly referred to by the media and some public officials as the "Hungate Plan." Although the compliment implied, inflates me with legitimate pride, it nevertheless must be denied! This judge did not write one line of the Agreement in Principle or the Settlement Plan. This comprehensive educational program, designed to resolve a difficult constitutional and social problem by voluntary, rather than mandatory, means, is the product of leading members of the St. Louis educational and legal communities. Equally important was the ability of numerous school board members, school officials, teachers, and administrators to take an area-wide view of the steps and sacrifices necessary to redress this problem.
[3] "Today, for most school children, busing is a convenience provided by the school system. Because of the greater economy and educational benefits achieved through consolidation, the number of schools and districts has declined enormously since the last century, so that today, for over half of the nation's children, the `neighborhood' school is no longer a reality; the distances to school are such that they ride a bus to school. Less than 7 percent of those children, or 3.6 percent of the total number of school children, are bused for the purpose of desegregation.

"The amount of time spent on school buses and their costs have figured prominently in criticism directed at busing for school desegregation. But statistical studies indicate that the median travel time for elementary school students was less than 15 minutes; only 15 percent of those students traveled more than 30 minutes.
"Critics should also be mindful of the fact that present constitutional law recognizes that a desegregation plan may not mandate busing involving time that would adversely affect the health of the students or the achievement of educational objectives. To the extent unreasonable transportation times are being imposed, then, modifications can and should be sought under existing law.
"The costs of busing have also been grossly misperceived by the public. One witness did a national survey of public attitudes about busing for desegregation, and learned that most people believe that more than a quarter of the school budget is spent on this function. In fact, the percentage is closer to 0.2 percent. Thus, the suggestion that `the money that is being spent on busing could be directed toward improving that quality of education perhaps through improved teacher salaries or better schools or books ...' must be recognized as inviting only minor improvements.
"In sum, criticism of busing for desegregation must be considered in light of the following: most American children are bused for nonracial reasons without apparent educational or health harm, or parental disapproval; relative to the total costs of public schools, the costs of busing for desegregation are not great; dissatisfaction with this method is voiced more often by those fearing future orders or otherwise not presently involved, than those participating in such a plan." (footnotes omitted.) Report of the Subcommittee on Civil and Constitutional Rights of the Committee on the Judiciary, House of Representatives, 97th Cong., 2d Sess., Mar., 1982, at 18-19.
[4] The financial adviser's estimate excludes any amount for attorney's fees for prevailing parties. Within 60 days, attorneys shall file any claim for fees and costs, together with time sheets, affidavits, and any necessary supporting documents for the Court's consideration.
[1] When we speak of the St. Louis metropolitan area, we are plagued with imprecise terms. The commonly used definition of the Office of Management and Budget of the St. Louis Standard Metropolitan Statistical Area (SMSA) includes St. Clair, Madison, Jersey, Monroe and Clinton Counties in Illinois. Under proper circumstances, federal courts may order intracity school desegregation, and they may, under proper circumstances, perhaps order intercounty school desegregation. This Court is unaware of precedent for interstate school desegregation. So referring to the St. Louis metropolitan area, which ordinarily includes a part of Illinois, is not altogether useful.

Franklin County, Missouri, qualifies under the standard definition of the St. Louis SMSA, and for undisclosed reasons, plaintiffs did not seek to join Franklin County, Missouri.
[1] "In Missouri for the first time in these pages we touch the South. This is emphatically a border as well as a middle western state. `Missouri would lose something if the Civil War were ever entirely settled,' wrote the Kansas City Star not long ago. The Missouri boot heel digs directly into what is veritably the `old' South, and one region is called `Little Dixie.' Missouri came into the union as an offset to Maine. The War Between the States split it savagely asunder; it gave 118,000 troops to the Confederate army, 116,000 to the federal. In blunt fact the Bushwhackers and others in Missouri fought their own Civil War, within the state's own frontiers, and traces of this still show." (footnote omitted.)